UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ANDREU MOORE,**

  **Petitioner,**

**v.**          **Case No. 8:18-cv-1555-MSS-AAS**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

  **Respondent.**
_____/

## O R D E R

  Andreu Moore petitions for the writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court convictions for burglary, two counts of sexual battery, and criminal mischief for which he is serving an aggregate 50-year sentence. (Doc. 1 at 1) After reviewing the petition, the response and appendix (Docs. 9 and 11), and the reply (Doc. 14), the Court **DENIES** the petition.

## BACKGROUND

  A jury found Moore guilty of the crimes. (Doc. 11-2 at 65–68) At trial, the victim testified that she and Moore dated and lived together for six years. When the two broke up, Moore moved out of the victim's home. Every few days, the victim and Moore contacted each other by telephone or text message. The victim still had feelings for Moore, but the relationship was broken.

  On March 27, 2009, the victim spent the evening with several friends at a bar in Tampa. Moore kept calling the victim and sending her text messages because Moore wanted the victim to come visit him. The victim told Moore to come visit her instead because she

knew that Moore lived 30 miles away and had neither a car nor any money to buy gas for the trip. In the past, when the victim told Moore to visit her, Moore stopped bothering her.

At 1:00 A.M. the victim returned home and sent a text message to Moore to let him know that she arrived home safely because he had asked her to do so. The victim heard a knock at her door and saw Moore outside. The victim asked Moore why he had come over and Moore pushed his way into the victim's home. Moore repeatedly hit the victim's face with a closed fist and demanded to know with whom she had been. Moore pressed down on the victim's shoulder with his foot and kicked the victim's shoulder through a wall.

Moore kept hitting the victim as he followed her upstairs. Moore slashed the screen on the victim's television with a pocketknife. The victim estimated that the value of the television was $2,700.00 new and $1,000.00 used. Moore used the pocketknife to cut off the victim's ponytail. After realizing the magnitude of what he had done, Moore sat on the floor and threatened to kill himself with the knife. Moore commented, "I'm at least going to get a nut before I die," dragged the victim into her bedroom, and vaginally and anally raped her while she cried and told him "no, don't." After the victim promised not to call the police, Moore left. Shortly after, Moore called the victim and left a voicemail lamenting, "I'm going to hell for what I've done." The prosecution introduced into evidence photographs of the victim's injuries, the victim's cut hair, and swabs from the victim's breast and vagina which contained a partial DNA profile matching Moore's DNA.

Moore testified in his own defense. Moore described his relationship with the victim as "dysfunctional." Moore dated another woman named Liz who made the victim jealous. A week before the incident, the victim called Moore, told Moore that she loved him, and said that she would see him soon. But Moore became upset when the victim later told him that

2

she would rather spend time with another man. Text messages showed that the victim invited Moore over to her home the night of the crimes. Moore claimed that he went over and had consensual vaginal sex with the victim. Afterwards the two argued about Liz, and Moore broke the victim's mobile telephone. The victim broke Moore's finger and Moore punched the victim a few times, pushed her butt through the wall, slashed the screen on her television, and cut her hair. Moore made the statement on the voicemail because he regretted beating up the victim.

Moore appealed, and the state appellate court affirmed his convictions and sentences. (Doc. 11-3 at 486) Moore sought post-conviction relief in state court (Docs. 11-3 at 491–93, 11-4 at 4–15, and 11-7 at 5–73, 145–57), which the post-conviction court denied (Docs. 11-3 at 494–524, 11-4 at 16–69, 11-7 at 158–319, and 11-8 at 41–312) and the state appellate court affirmed (Docs. 11-3 at 535, 11-4 at 94, and 11-8 at 384). Also, Moore filed a petition alleging ineffective assistance of appellate counsel (Doc. 11-5 at 2–193), which the state appellate court denied. (Doc. 11-5 at 195) Moore's timely federal petition followed.

## STANDARDS OF REVIEW

### AEDPA

Because Moore filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)    resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 694 (2002). An unreasonable application is "different from an incorrect one." *Id.* Even clear error is not enough. *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Moore asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984) explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

The Court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 691. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). Because the

standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

The state appellate court affirmed in a decision without an opinion the post-conviction court's order denying Moore's ineffective assistance of counsel claims. (Doc. 11-8 at 384) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Because the post-conviction court recognized that *Strickland* governed the claims (Docs. 11-7 at 159–60 and 11-8 at 42–43), Moore must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact.

## MERITS

### Ground One

Moore contends that a doctor diagnosed him with attention deficit hyperactivity disorder which rendered him unable to consult with or assist trial counsel with his defense. (Doc. 1 at 6–7) He contends that trial counsel knew about the diagnosis and Moore's mental health treatment for the diagnosis. (Doc. 1 at 7) He asserts that trial counsel was ineffective for not moving for a competency evaluation before trial. (Doc. 1 at 6–7) The post-conviction court denied the claim as follows (Doc. 11-8 at 43–46) (state court record citations omitted):

> The Defendant claims that counsel was ineffective for failing to
> request a competency determination prior to proceeding to trial.

A claim of ineffective assistance of counsel for failing to investigate a defendant's mental health or seek a competency evaluation is cognizable in a motion for postconviction relief. *Watts v. State*, 82 So. 3d 1215, 1216 (Fla. 2d DCA 2012) ("[T]he narrow argument that counsel was ineffective for failing to raise a defendant's competency is cognizable in a rule 3.850 motion.") (internal citation omitted).

A defendant's competence is essentially a measure of "'whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.'" *Dusky v. United States*, 362 U.S. 402, 402 (1960); *see also* Fla. R. Crim. P. 3.211(a)(2)(A). "To satisfy the deficiency prong based on counsel's handling of a competency issue, the postconviction movant must allege specific facts showing that a reasonably competent attorney would have questioned competence to proceed." *Thompson v. State*, 88 So. 3d 312, 319 (Fla. 4th DCA 2012). In order to demonstrate prejudice, the defendant must "set forth clear and convincing circumstances that create a real, substantial and legitimate doubt as to [his or her] competency." *Id.* In other words, a defendant must demonstrate "actual incompetency." *Id.* "Mere conclusory allegations are not sufficient to meet this burden." *Atwater v. State*, 788 So. 2d 223, 229 (Fla. 2001) (citing *Kennedy v. State*, 547 So. 2d 912 (Fla. 1989)). In addition, the mere fact that a defendant may have mental health diagnoses, substance abuse issues, or be prescribed psychotropic medication does not necessarily indicate that he or she is incompetent to proceed to trial or to enter a plea. *See Thompson*, 88 So. 3d at 319 ("[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.") (quoting *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995)).

The Defendant alleges that because of his Attention Deficit Hyperactivity Disorder (ADHD), he was suffering from symptoms which "rendered him unable to consult with his attorney with a reasonable degree of rational understanding and assist him with presenting a defense" because of his "inability to maintain organized thought or understand what his attorney conveyed to him concerning his case." He indicates that counsel relayed his observations of the Defendant's symptoms to the Court during a pretrial hearing on February 17, 2010, including that the Defendant has poor concentration and judgment, that he "gets hyper," and that this behavior tended to interfere with

their communication. The Defendant contends that such observations, in addition to counsel's awareness of the Defendant's mental health history, which included being committed several times under the Baker Act, would have led any reasonably competent attorney to question whether he was competent to proceed. He asserts that because of counsel's failure to move for a competency determination "there exists a real, substantial, and legitimate doubt" as to the Defendant's competency at trial. The State was directed to respond to this claim.

In its response, the State contends that counsel was not deficient because the Defendant was evaluated and was not incompetent prior to or during trial. The State points out that during the course of a *Nelson*[6] hearing held on February 17, 2010, defense counsel indicated that he was going to have Dr. Carpenter evaluate the Defendant. The State also notes that after the Defendant was convicted, at the sentencing hearing, counsel explained that he did have the Defendant evaluated and that the Defendant suffers from a "cyclothymic disorder," which is a type of bipolar disorder. Accordingly, the State argues that counsel did have the Defendant evaluated and that expert found that the Defendant had a mental health problem but not one that arose to the level of incompetence.

[6] *Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973).

Furthermore, the State contends that a thorough review of the record reveals that the Defendant was competent to stand trial. More specifically, the State points to the *Nelson* hearing to demonstrate that the Defendant had a sufficient present ability to consult with counsel and had a rational, as well as factual, understanding of the pending proceedings. The State alleges that at the *Nelson* hearing, the Defendant was able to articulate exactly why he felt counsel was ineffective, and was able to testify relevantly to the matter at hand. The State alleges that the Defendant complained that counsel had not given him the entire discovery in his case and that he had requested the bond hearing transcript because the victim had made statements that could potentially be used as impeachment. The State indicates that the Defendant explained that he was trying to help counsel point out inconsistencies in the victim's statements but was unable to do so with the incomplete discovery. Additionally, the State points out that the Defendant was able to articulate his concern that counsel had previously suggested they make an offer and that

counsel's position on what was a reasonable offer had changed since that meeting without any apparent justification. The State alleges that throughout the *Nelson* hearing, the Defendant exhibited appropriate courtroom behavior by speaking in turn and apologizing when he interrupted another party. The State points out that when asked questions throughout the *Nelson* hearing, the Defendant was able to respond appropriately to each of those questions.

Additionally, the State contends that going into and during the course of the trial, the Defendant's behavior and statements further demonstrated that he understood exactly what was happening. The State alleges that prior to jury selection, the Defendant made another plea offer which the State rejected and commented that the Defendant refuses to make an offer that includes a sex crime conviction because he discussed the consequences of that conviction with other inmates in jail. The State contends that this shows a clear understanding of the ramifications of a conviction. The State further points out that at the conclusion of the State's case, the trial court engaged the Defendant under oath about his decision to testify. The State indicates that at that time, the Defendant indicated that he was not taking any medication and that he had a clear mind. The State points out that twice the Defendant indicated that he was not confused at all. The State alleges that the Defendant also told the Court that he had a clear mind the day before. The State alleges that the Defendant testified in his own defense; and, that throughout his testimony, he stayed on topic and testified relevantly.

Although the record reflects that defense counsel had the Defendant evaluated, it is not clear that such evaluation was for purposes of determining the Defendant's competency to stand trial. Nonetheless, the Defendant's argument is refuted by the record. As noted above, the test for competency asks "'whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.'" *Hill v. State*, 473 So. 2d 1253, 1257 (Fla. 1985) (quoting *Dusky*, 362 U.S. at 402). In this instance, the record makes clear that the Defendant was competent at the time of trial. During a pre-trial discussion on the morning of trial, the Defendant indicated that he understood the possible consequences of going to trial and that he wanted to proceed. Additionally, the Defendant's communication with the Court regarding whether or not the Defendant was satisfied with the

jury selection indicates competence. As the State points out, the Defendant demonstrated a sufficient ability to consult with his lawyer and a rational understanding of the proceedings against him at his *Nelson* hearing. Additionally, the Defendant did testify in his own defense, and his testimony indicates competence. In light of the foregoing, the record refutes the Defendant's claim that counsel was ineffective for failing to investigate his competency. The Court finds that counsel was not ineffective [ ] nor was the Defendant prejudiced. [The ground] is therefore denied.

At a hearing just before trial, the trial court addressed Moore as follows (Doc. 11-8 at 248):

| [Prosecutor:] | Judge, he scores 20 years to life. Received an offer last week of a felony battery and five years DOC, which was rejected — |
|---|---|
| [Court:] | Oh, okay. |
| [Prosecutor:] | — by the State and the victim. |
| [Court:] | Okay. All right. So, Mr. Moore. |
| [Moore:] | Yes, ma'am. |
| [Court:] | You understand that if you are convicted, you could receive up to life in prison, as a sentence on these charges; do you understand? |
| [Moore:] | Yes, ma'am, I do. |
| [Court:] | Okay. And we're going to be starting the trial today, so you could still try to work something out with the State if you wanted to. |
| [Moore:] | Okay. Yes, ma'am. |
| [Court:] | You know, in the next few minutes, things happen sometimes, but — and feel free to do that if you wanted to. If it doesn't get worked out, we'll have the trial. And you |

<table>
<tr><td></td><td>need to know you could — you're facing life in prison on these charges.</td></tr>
</table>

[Moore:]      I understand.

[Court:]      Okay. All right. So, we'll let you go back and get your clothes together.

[Moore:]      All right. Thank you.

[Court:]      Okay.

(The defense attorney and the defendant have a conversation.)

[Moore:]      Thank you, your Honor. I appreciate your time.

[Court:]      Sure.

After jury selection, the trial court conducted a colloquy with Moore as follows (Doc. 11-8 at 101–02):

[Court:]      And would you state your full name?

[Moore:]      Andreau Lane Moore.

[Court:]      And how old are you, Mr. Moore?

[Moore:]      Thirty-five.

[Court:]      Okay. And have you been paying attention this morning during the jury selection?

[Moore:]      Yes, ma'am, I have.

[Court:]      Did you see the seating chart that has all the jurors on it?

[Moore:]      Yes, ma'am, I did.

[Court:]      All right. And did you get an opportunity to consult with Mr. McClure, your attorney, about who you wanted to use strikes on and who you wanted to keep for the jury?

| [Moore:] | Yes, ma'am. |
| [Court:] | And based on that seating chart, do you realize who the jurors are that are picked now? |
| [Moore:] | Yes, ma'am, I do. |
| [Court:] | Okay. And are you satisfied with those jurors to be your jury for the trial? |
| [Moore:] | Yes, ma'am, I am. |
| [Court:] | Okay. Did you need any more time to speak to Mr. McClure about that? |
| [Moore:] | No, ma'am. |
| [Court:] | Okay. All right. Thank you. |
| [Moore:] | Thank you. |

Before Moore testified, the trial court conducted an additional colloquy with Moore as follows (Doc. 11-3 at 271–75):

| [Court:] | All right. State your full name. |
| [Moore:] | Andreu Lane Moore. |
| [Court:] | And you can put your hand down? |
| [Moore:] | Yes, ma'am. |
| [Court:] | And, Mr. Moore, what is your age? |
| [Moore:] | Thirty-five. |
| [Court:] | And how far have you gone in school? |
| [Moore:] | Graduated. |
| [Court:] | From high school? |
| [Moore:] | GED. |

[Court:]          Okay. Can you read and write?

[Moore:]          Yes, ma'am?

[Court:]          Are you currently under the influence of drugs, alcohol or medication of any kind?

[Moore:]          No, ma'am.

[Court:]          Okay. And you've been at the jail. So do they prescribe any medication for you there?

[Moore:]          I'm not on any right now, your Honor.

[Court:]          Okay. So do you have a clear mind right now?

[Moore:]          Yes, ma'am.

[Court:]          So some is prescribed but you haven't take[n] any today?

[Moore:]          I haven't been taking it for [awhile].

[Court:]          Okay. Do you have any confusion whatsoever?

[Moore:]          No, ma'am.

[Court:]          Okay. So you have a perfectly clear mind today in your trial?

[Moore:]          Yes, ma'am.

[Court:]          Did you have a clear mind yesterday?

[Moore:]          Yes, ma'am, I did.

[Court:]          And you heard all of the testimony yesterday and today?

[Moore:]          Yes, ma'am.

[Court:]          All right. And so your attorney tells me you've decided you want to testify in the trial.

[Moore:]          Yes, ma'am.

[Court:]          All right. Now, you understand if you testify, the state attorney can cross-examine you?

[Moore:]          Yes, ma'am.

[Court:]          Okay. And that if you chose not to testify, you could not be cross-examined. You couldn't be asked any questions. Do you understand?

[Moore:]          Yes, ma'am. I understand.

[Court:]          And while you may have consulted with your attorney about that, you understand that's your own independent decision?

[Moore:]          Yes, ma'am, I do.

[Court:]          Okay. And you understand you fully have the right to remain silent if that's what you wanted to do?

[Moore:]          Yes, ma'am.

[Court:]          Has anyone forced you, threatened you or coerced you to testify?

[Moore:]          No, ma'am.

[Court:]          Has anyone put any pressure on you in any way —

[Moore:]          No.

[Court:]          — to suggest to you or make you feel like you had to testify?

[Moore:]          I feel like it's in my best interest.

| [Court:] | Okay. And that's your own independent decision. |
| [Moore:] | Yes, ma'am, it is. |
| [Court:] | Okay. Do you need any further time to speak with your attorney about your decision? |
| [Moore:] | No, ma'am. |
| [Court:] | Okay. Because when the jury comes back in, which is [going to] be right now, then you would be called to testify. |
| [Moore:] | I understand. |
| [Court:] | Okay. All right. Then I do find that your decision to testify is freely, voluntarily, knowingly and intelligently made. . . . |

Moore testified in his own defense at trial. Moore told the jury about his background, described his relationship with the victim, identified several times when he and the victim argued, and described in detail what happened on the night of the crimes. (Doc. 11-8 at 198–239) Moore claimed that the victim invited him to her home, both had consensual sex, and the two physically fought after the consensual sex. (Doc. 11-8 at 409–21)

Lastly, a year before trial, Moore moved to discharge trial counsel. (Doc. 11-8 at 66) At a hearing on the motion, Moore articulated in detail why he wanted to discharge counsel. (Doc. 11-8 at 66–68) When the trial court denied Moore's request to discharge trial counsel, Moore demanded to proceed *pro se*. (Doc. 11-8 at 79) The trial court conducted an additional colloquy with Moore to comply with *Faretta v. California*, 422 U.S. 806 (1975). (Doc. 11-8 at 79–89) Moore responded coherently to the trial court's questions, showed disappointment when the trial court refused to discharge counsel, and decided to continue with representation by trial counsel. (Doc. 11-8 at 79–89)

Because the record refutes the contention that Moore was incompetent to proceed, trial counsel was not ineffective and the state court did not unreasonably apply *Strickland*. *Dusky v. United States*, 362 U.S. 402, 402 (1960) (holding that the test for incompetency is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him"); *Rivers v. Turner*, 874 F.2d 771, 774 (11th Cir. 1989) ("Claims of incompetency to stand trial should not be considered in habeas corpus proceedings unless the facts are sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner to meaningfully participate and cooperate with counsel during a criminal trial.") (internal quotation marks and citation omitted); *Alexander v. Dugger*, 841 F.2d 371, 375 (11th Cir. 1988) ("Alexander has made only conclusory allegations that he was incompetent to stand trial; he gives no concrete examples suggesting that at the time of his trial he did not have the ability to consult with his lawyer or that he did not understand the proceedings against him."). Ground One is denied.

**Ground Two**

Moore asserts that trial counsel was ineffective for not investigating and presenting an involuntary intoxication defense. (Doc. 1 at 9–10) He contends that trial counsel knew that doctors treated Moore for mental illness and had prescribed him Vyvanse, which has side effects including uncontrollable anger, emotional outbursts, paranoia, auditory and visual hallucinations, mania, depression, and psychosis. (Doc. 1 at 9) At her deposition the victim testified that Moore suffered from mental illness, had abused crystal methamphetamine and alcohol, and acted bizarrely and threatened to kill himself during the crimes. (Doc. 1 at 9) The

16

post-conviction court denied the claim as follows (Doc. 11-8 at 47–50) (state court record

citations omitted):

> [T]he Defendant claims that counsel was ineffective for failing to
> investigate and pursue an involuntary intoxication defense due
> to the Defendant's diagnosis of ADHD. . . . [T]he Defendant
> indicates that defense counsel was aware of the Defendant's
> ADHD diagnosis and explained his observation of the
> Defendant's behavior at a pretrial hearing on February 17, 2010.
> In support of this claim, the Defendant asserts that he was
> prescribed Vyvanse for the treatment of his ADHD, and that he
> was advised by defense counsel that Vyvanse had a known side
> effect of causing uncontrollable anger and emotional outbursts.
> He argues that had counsel conducted further research into this
> medication, he would have learned that other relevant adverse
> reactions include "paranoia, being suspicious, and believing
> things that are not true or real." The Defendant asserts that "it is
> highly probable that, at the time of the offense, [he] could not
> form the specific intent elements of his convictions" and that
> there is a reasonable probability that he would have been found
> not guilty by reason of involuntary intoxication had counsel
> investigated and pursued that defense. The State was directed to
> respond to this claim.
>
> In its response, the State contends that defense counsel was not
> deficient for failing to pursue an involuntary intoxication defense
> because it was not supported by the evidence. First, the State
> alleges that while the Defendant points to the victim's deposition
> as support for his contention that he had ADHD, the victim
> specifically testified that, while he had been diagnosed with that
> condition, the Defendant's physician prescribed him Stratara,
> not Vyvanse, and that the Defendant had taken himself off his
> medication at the time of the offense.
>
> Moreover, the State contends that even if the Defendant was
> taking Vyvanse at the time of the offense, the evidence still does
> not support a finding that the Defendant was involuntar[ily]
> intoxicated. The State alleges that in order to prove that the
> defense applies, the Defendant must prove that he was
> intoxicated to the point that either he was unable to form the
> specific intent to commit the crime or that he was insane at the
> time of the offense. Accordingly, the State argues that because
> the defense of involuntary intoxication only applies to cases in
> which a specific intent was required it would not have been a
> defense to the sexual battery charges in this case; rather, it would

only have been a defense to the burglary and felony criminal mischief charges. However, the State argues that the evidence adduced at trial showed that the Defendant was completely aware of his actions once he arrived at the victim's home. The State points out that the Defendant's testimony included a full acknowledgement of driving to the victim's home, beating her, and damaging her property. The State alleges that at no point did the Defendant say that he was out of control or that he did not understand or remember what he was doing. Indeed, the State contends that the Defendant's testimony demonstrates a full recollection of his actions; he simply disputes the victim's position that the entry and sexual contact were not consensual. The State alleges that after the Defendant left the scene of the crime he called the victim and acknowledged that what he had done was wrong. Furthermore, the State contends that neither the testimony from the victim nor the Defendant's own account of the events reference any indication of any intoxication, let alone intoxication to the extent that the Defendant did not have the intent to commit the crimes with which he was charged. The State contends that had defense counsel sought this defense it is unlikely that the Court would have allowed such evidence or the involuntary intoxication instruction, and that no jury would have been convinced of this theory.

The Court finds the Defendant's claim is without merit. First, the Court notes that the Defendant's claim is refuted by the record. As the State points out, the Defendant's reference to the victim's deposition as support of his contention that he was involuntarily intoxicated at the time of the offenses is misplaced. In fact, the victim stated in her deposition that the Defendant had been prescribed Stratara for his ADHD, and not Vyvanse. Additionally, the victim indicated that the Defendant had taken himself off of the ADHD medication and had been off of it for a while when the offenses occurred. Furthermore, during sentencing, defense counsel indicated to the Court that the Defendant has ADHD "which at the time of this offense was unmedicated." Thus, as the record reflects that the Defendant was not on any prescribed medication at the time of the offenses, an involuntary intoxication defense would not have been viable. Accordingly, counsel was not deficient and the Defendant was not prejudiced.

In an abundance of caution, the Court will analyze the Defendant's claim as if he were in fact taking Vyvanse at the time of the offenses, as alleged in his motion. An accused may be completely relieved of criminal responsibility if, because of

involuntary intoxication, he was temporarily rendered legally insane at the time he committed the offense. *Brancaccio v. State*, 698 So. 2d 597, 599 (Fla. 4th DCA 1997). In order to establish an involuntary intoxication defense, a defendant must first present sufficient evidence that an intoxicated condition was brought about by the introduction into the defendant's body "of any substance which he does not know and has no reason to know has a tendency to cause an intoxicated or drugged condition." *Brancaccio*, 698 So. 2d at 600 n.4. "The defendant would then have the burden to prove that this involuntary intoxication rendered him unable to understand what he was doing and to understand the consequences of his actions, or if he did understand, that he was unable to know that his actions were wrong." *Brancaccio v. State*, 27 So. 3d 739, 740–41 (Fla. 4th DCA 2010). Moreover, involuntary intoxication is not a defense to general intent crimes.

In the instant case, sexual battery is a general intent crime to which involuntary intoxication is not a defense. *See Wright v. State*, 675 So. 2d 1009, 1010 (Fla. 2d DCA 1996). Accordingly, counsel was not ineffective for failing to pursue such a defense for purposes of the two sexual battery charges. As to the specific intent crimes of burglary and criminal mischief, the Court finds that an involuntary intoxication defense would not have succeeded because the evidence demonstrates that the Defendant understood what he was doing, understood the consequences of his actions, and knew that his actions were wrong; thus, the Defendant was not prejudiced. More specifically, the Defendant gave a clear and detailed account of the events of the night at issue during his testimony. Additionally, the Defendant gave specific details relating to his state of mind that night. He testified that while they were engaging in vaginal intercourse, he attempted anal intercourse with her but she was not really into it so they switched back to vaginal intercourse. Additionally, he asked "if she was back on her pill," so that he could ejaculate in her. The Defendant recalled that following the intercourse, he and the victim got into an argument about cheating on each other and he admitted to breaking her phone after looking through it. The Defendant testified that he then went to leave the victim's home and she threw a perfume bottle at him and popped his finger. The Defendant further testified that at that point he could feel the pain in his hand and got mad and hit and kicked the victim. He testified that he pulled a pocket knife out and cut her [television] because he thought that would make her even madder. He further testified that he cut the victim's hair; was mad at himself and flipped the victim's table over; and then went

and sat down because he knew he "went way too far." Once he looked back up at the victim and saw her injuries, the Defendant testified that he apologized to her and told her to "call the law." The Defendant testified that he admitted to the victim that he was going to jail, advised the victim to just call the police, and was apologizing. The Defendant further testified that when he left the victim's home, he called the victim and left her a message indicating that he was going to hell for what he did. The Court finds that this testimony demonstrates that the Defendant understood his actions and the possible consequences of his actions; and, that he knew that his actions were wrong. In other words, the affirmative defense of involuntary intoxication was not a viable defense in the Defendant's case. Accordingly, the Defendant was not prejudiced by counsel's failure to raise this defense. [The ground] is therefore denied.

The record refutes Moore's claim that he was taking Vyvanse at the time of the crimes.

At her deposition, the victim testified as follows (Doc. 11-8 at 271):

| [Trial counsel:] | Did he have mental health problems? |
|---|---|
| [Victim:] | He? |
| [Trial counsel:] | Yes. |
| [Victim:] | Oh, most definitely. He abused crystal meth, and he drank frequently, and he was very paranoid and very, you know, just accused me of these crazy things, like I said, you know, having a relationship with my stepfather, which is just disgusting. |
| [Trial counsel:] | Did he have a diagnosis or seek treatment for mental health problems? |
| [Victim:] | He went to — yeah. He went to treatment, if you can call it that. I was like, you need help; you need help; you need help. So he made an appointment with this guy and he put him on ADHD medication. I'm |

not going to say he didn't have ADHD, but I really think the use of the crystal meth totally, like, screwed up his head and, like, thinking processes and stuff like that. I don't think he, you know, I'm not a psychiatrist or anything by any means, but I don't — it didn't help him. I mean, it did a little bit, it calmed him down a little bit, and they even put him on anti-seizure medication to try to get his brain to stop, you know, racing constantly. But he didn't stay on it like —

[Trial counsel:]   You didn't notice any difference?

[Victim:]   I mean, well a little bit, and then, you know, he would take himself off of it, so he did that twice. He got on one medication that when — the anti-seizure was the first one, and then he didn't like how that made him feel, so he took himself off of that and went to a doctor — he went back to the doctor, or it may have been a different doctor, I'm not sure, he went to a couple, and they put him on Stratara, his ADHD medication.

[Trial counsel:]   Was he on that during this event?

[Victim:]   No, he had taken himself off that for — he had been off of that for a while.

Also, at the sentencing hearing, trial counsel advised the trial court that an expert who evaluated Moore's mental health diagnosed him with bipolar disorder and attention deficit hyperactivity disorder, "which at the time of this offense was unmedicated and is probably what cause the extreme rage." (Doc. 11-8 at 242–43)

Whether the involuntary intoxication defense applies to the crime of sexual battery is an issue of state law, and a state court's determination of state law receives deference in federal court. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017). Sexual battery is a general intent crime for which involuntary intoxication is not a defense. *Daniels v. State*, 313 So. 3d 247, 253 (Fla. 1st DCA 2021) ("[E]vidence of involuntary intoxication is admissible only to negate the intent required for specific intent crimes."); *Orme v. State*, 896 So. 2d 725, 736 (Fla. 2005) ("Sexual battery is a general intent crime to which voluntary intoxication is not a defense."). Consequently, trial counsel was not ineffective for failing to request the involuntary intoxication instruction for that offense. *Pinkney*, 876 F.3d at 1297 ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Burglary and criminal mischief are specific intent crimes. *T.A.W. v. State*, 113 So. 3d 879, 881 (Fla. 2d DCA 2012) ("Burglary, of course, is a specific intent crime."); *R.E. v. State*, 13 So. 3d 97, 98 (Fla. 4th DCA 2009) ("A defendant must possess the specific intent to damage the property of another to be found guilty [of criminal mischief]."). For the involuntary intoxication defense, "[t]he defendant must show that he 'unexpectedly bec[ame] intoxicated by prescribed medication that [wa]s taken in a lawful manner.'" *Jacobson v. State*, 171 So. 3d 188, 190 (Fla. 4th DCA 2015). "The defendant [ ] then [has] the burden to prove that this involuntary intoxication rendered him unable to understand what he was doing and to understand the consequences of his actions, or if he did understand, that he was unable to know that his actions were wrong." *Brancaccio v. State*, 27 So. 3d 739, 741 (Fla. 4th DCA 2010).

At trial, Moore testified with a clear and lucid recollection of the events on the evening of the crimes and acknowledged that he showed remorse for what he had done. Moore described having sexual intercourse with the victim, getting into an argument, hitting and kicking her, slashing her television with a pocketknife, and cutting her hair. (Doc. 11-8 at 215–22) Afterwards, Moore was mad at himself, flipped a table, threatened to kill himself, apologized to the victim several times, told the victim to call the police, lamented that he was going to jail, and later left her a voicemail that he was going to go to hell for what he had done. (Doc. 11-8 at 220–223) Moore admitted that he beat the victim but denied that forced his way into the victim's home or sexually battered her.

Because Moore's own testimony would have undermined the involuntary intoxication defense, the defense would not have succeeded at trial. *Butler v. State*, 891 So. 2d 1185, 1186 (Fla. 4th DCA 2005); *Bourriague v. State*, 820 So. 2d 997, 999 (Fla. 1st DCA 2002). Consequently, trial counsel was not ineffective and the state court did not unreasonably apply *Strickland*. *White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir. 1992) (holding that trial counsel was not ineffective for failing to present an intoxication defense because "[the petitioner's] acts [were] hardly consistent with a person so impaired as to be unable to form the intent required for committing the crime charged"); *Presnell v. Zant*, 959 F.2d 1524, 1533 (11th Cir. 1992) (holding that trial counsel was not ineffective for failing to present an insanity defense because "[the] petitioner had failed to produce any evidence whatsoever to support any claim of insanity") (internal quotations omitted). *Accord Baldwin v. Blackburn*, 653 F.2d 942, 947 (5th Cir. Unit A 1981) ("Appellant precipitated the abandonment of the intoxication defense when he testified on cross-examination that he was fully conscious of his activities on the night of the murder."). Ground Two is denied.

**Ground Three**

Moore asserts that trial counsel was ineffective for neither investigating nor contesting evidence concerning the amount of damages for the criminal mischief conviction. (Doc. 1 at 11–13) The prosecution charged Moore with criminal mischief for damage to the victim's television in excess of $1,000.00. (Doc. 1 at 12) Moore contends that trial counsel should have impeached the victim with her prior inconsistent statement concerning the value of the television ("Sub-claim A"), objected to the victim's hearsay testimony about the value of the television ("Sub-claim B"), and presented evidence to show that the television was worth $800.00. ("Sub-claim C"). (Doc. 1 at 12–13)

**Sub-claim A**

Moore asserts that trial counsel was ineffective for not impeaching the victim with her prior inconsistent statement concerning the value of the victim's television. (Doc. 1 at 12) The post-conviction court denied the sub-claim as follows (Doc. 11-8 at 50–51) (state court record citations omitted):

> The Defendant argues that counsel was ineffective for failing to impeach the victim with her prior inconsistent statements concerning the price of the television that was damaged. He asserts that the victim provided inconsistent statements regarding the value of the television in her initial statement to law enforcement, at her deposition, and during her trial testimony. The Defendant alleges that counsel's failure to impeach the victim with her prior inconsistent statements left it up to the jury to determine the value of the damage to the television set. He further alleges that the outcome of the trial would have been different had counsel so impeached the victim because the jury would have found the Defendant guilty of a misdemeanor and not the felony of which he was convicted. The State was directed to respond to this claim.
>
> In its response, the State contends that counsel was not deficient because defense counsel did indeed impeach the victim's testimony about the cost of the [television] with her deposition

24

> testimony. As the State correctly points out, during cross-examination of the victim, defense counsel asked: "When I took your deposition, ma'am, on page 46, line 10, you said, I really don't know. I tried to look it up, you know, to see how much it's worth, but I couldn't find anything." Counsel then asked: "It's at page 46, ma'am. So is it a fair statement that you really don't know how much this thing is worth?" The victim responded, "Right. I saw different things. I could not find for[-]definite, you know, because people could try to sell things for however much they want." Accordingly, the Court finds that counsel was not deficient because counsel did impeach the victim with her prior deposition testimony and got her to admit that she did not know the value of the television set. Therefore, [the sub-claim] is denied.

The state court accurately quoted the victim's testimony on cross-examination. (Doc. 11-8 at 177–78) Trial counsel successfully impeached the victim at trial with her inconsistent deposition testimony concerning the value of the television. (Doc. 11-8 at 177–78) When confronted with her inconsistent statement, the victim admitted that she did not know how much the television was worth. (Doc. 11-8 at 177) Consequently, the state court did not unreasonably determine that the record refutes the sub-claim.

**Sub-claim B**

Moore asserts that trial counsel was ineffective for not objecting to the victim's hearsay testimony about the value of the television. (Doc. 1 at 12) The post-conviction court denied the sub-claim as follows (Doc. 11-8 at 51–52) (state court citations omitted):

> [T]he Defendant claims that counsel was ineffective for failing to object to the victim's hearsay testimony concerning the price of the television. He argues that the victim's testimony regarding the price of the television amounted to inadmissible hearsay because she did not purchase the television, but instead received it as a gift, and further testified that "people on the internet were trying to sell the same model for $1000.00." The Defendant alleges that counsel's failure to object to the victim's hearsay left it up to the jury to determine the value of the damage to the television set. He further alleges that the outcome of the trial would have been different had counsel so objected because the

jury would have found the Defendant guilty of a misdemeanor and not the felony of which he was convicted. The State was directed to respond to this claim.

In its response, the State contends that the Defendant was not prejudiced by the victim's testimony regarding the cost of the [television] because . . . defense counsel did impeach the victim with her prior statements and pointed out that she really had no idea how much the [television] cost at the time of its purchase or its current value. Additionally, the State contends that the criminal mischief charge did not specify that it was based solely on the damage to the [television]. Thus, the State argues that it could prove felony criminal mischief based on the totality of the property damage committed during this crime, which included: a hole in the wall from where the Defendant kicked the victim's shoulder into the wall; two broken necklaces; a broken cell phone; a damaged glass coffee table; and the television. Accordingly, the State argues that the jury could certainly have found that the total cost of all of the damaged property, including the television, was over $1,000, proving the crime of felony criminal mischief.

Because the felony information charging the Defendant with felony criminal mischief solely references damage to the television, the Court is not persuaded by the State's argument that the charge of felony criminal mischief did not specify that it was based solely on the damage to the television. Nonetheless, the Court finds that the Defendant was not prejudiced by his counsel's failure to object to the victim's testimony concerning the price of the television. The statement with which the Defendant takes issue was actually elicited by defense counsel during cross-examination of the victim. In context, counsel was attempting to impeach the victim and get her to admit that she did not know the value of the television. Additionally, although defense counsel did not object to the testimony he himself elicited from the victim, counsel did comment on that specific piece of testimony as being "rank hearsay" during his closing argument. Accordingly, the Court finds that the Defendant was not prejudiced because counsel was attempting to impeach the victim and thereafter indicated to the jury that a portion of the testimony which he elicited was hearsay and unreliable. This claim is therefore denied.

On cross-examination, trial counsel asked the victim if she learned from the internet

how much the television was worth (Doc. 11-8 at 177):

| | |
|---|---|
| [Counsel:] | Okay. This television set, you had said that you thought it might have been $2,700. Could it have been less? |
| [Victim:] | Yeah. 27 — or actually it could have been more. I'm not exactly sure because — |
| [Counsel:] | You tried to find out how much it was worth and failed, right? |
| [Victim:] | Yes. |
| [Counsel:] | So you really don't know what the value of your set was back on March 27? |
| [Victim:] | Well, it was a few years old. So it was considerably — like half of how much it cost, if not less. |
| [Counsel:] | Well, you can't even really say that. Isn't it true you tried to check on the internet and see how much it was worth? |
| [Victim:] | I did and I saw like $1,000 — |
| [Counsel:] | Okay. |
| [Victim:] | — on websites that people were trying to sell them, the same exact serial number, model number, whatever you want to call it. |
| [Counsel:] | When I took your deposition, ma'am, on page 46, line 10, you said, I really don't know. I tried to look it up, you know, to see how much it's worth, but I couldn't find anything. |

. . .

| | |
|---|---|
| [Counsel:] | It's [at] page 46, ma'am. So is it a fair statement that you really don't know how much this thing was worth? |
| [Victim:] | Right. I saw different things. I could not find a for[-]definite, you know, because people could try to sell things for however much they want. |
| [Counsel:] | Right. |
| [Victim:] | I could not find, I don't know, something dating back that far saying how much, you know, it would be worth. |

The victim directly responded to trial counsel's question and testified that she learned on the internet that the television was worth $1,000.00. (Doc. 11-8 at 177) Because trial counsel opened the door to the victim's response, an objection to the testimony based on hearsay would not have succeeded. *Thompson v. State*, 648 So. 2d 692, 695 (Fla. 1994) ("Although we can sympathize with the defense attorney's frustration in questioning a less than sophisticated witness, it is apparent from the record that this damaging hearsay response was invited by defense counsel's question."); *Cartwright v. State*, 885 So. 2d 1010, 1014 (Fla. 4th DCA 2004) ("The primary consideration in deciding whether a party has opened the door to comments on cross-examination is whether the witness's answer is responsive to the question asked. If it is, then it is considered invited error.").

After trial counsel confronted the victim on cross-examination with her inconsistent deposition testimony, the victim agreed that she "really [didn't] know how much this thing was worth," and she "could not find . . . something dating back that far saying how much, you know, it would be worth." (Doc. 11-8 at 177) Instead of objecting to the victim's testimony based on hearsay, trial counsel chose to successfully impeach the victim. By

choosing to impeach the victim, trial counsel discredited the victim's overall credibility, including her credibility concerning the more serious charges. *Hunt v. Comm'r, Ala. Dep't Corrs.*, 666 F.3d 708, 724 (11th Cir. 2012) ("'There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.'") (quoting *Richter*, 562 U.S. at 109); *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004) ("[I]ntroduction of a prior statement that is inconsistent with a witness's present testimony is also one of the main ways to attack the credibility of a witness. . . . The theory of admissibility is not that the prior statement is true and the in-court testimony is false, but that because the witness has not told the truth in one of the statements, the jury should disbelieve both statements.") (citations omitted).

Also, trial counsel reminded the jury during closing argument that the victim's testimony concerning the value of the television was unreliable (Doc. 11-8 at 240–41):

> [Trial counsel:]  Now, think about this in terms of what the State has to prove. They've proven that he did that, that he slashed it, that he did it willfully, that he did it maliciously. He wanted to get back at her. So he slashed this TV set. But what have they proven in terms of the value of that set? Well, [the victim] took the stand and said it was originally $2,700, but it was purchased at a time when these sets were brand new and it was high priced. So the price came down.
>
> And she tried to find how much it was worth. She actually said she got on the internet and learned that people were trying to sell these sets for $1,000 that were that same age. So was the set worth $1,000? Well, if you believe the internet, which is rank hearsay. And I would suggest to you that there really isn't any competent proof of the value of that TV set. There was some

> sort of effort made, but not proof beyond a reasonable doubt.
>
> Was there a criminal mischief, yes? No question, beyond a reasonable doubt. But did they prove the value beyond a reasonable doubt? I would suggest no, they didn't, because you really don't know what the value of that set is. You would have to speculate in order to convict him of the $1,000 or more. You would have to guess, well, it's only a couple years old. Maybe it would be worth more than $1,000, but you don't know by competent evidence.

The jury convicted Moore of felony criminal mischief despite knowing that the defense believed the victim's testimony concerning the value of the television was unreliable and untrustworthy.(Docs. 11-2 at 68 and 11-8 at 240–41) Because an objection to the victim's testimony on cross-examination concerning the value of the television would not have succeeded and because Moore has not shown that the outcome at trial would have changed, the state court did not unreasonably apply *Strickland*. *Strickland*, 466 U.S. at 694; *Pinkney*, 876 F.3d at 1297.

### Sub-claim C

Moore asserts that trial counsel was ineffective for not presenting evidence that the television was worth $800.00. (Doc. 1 at 13) The post-conviction court denied this sub-claim as follows (Doc. 11-8 at 52) (state court record citations omitted):

> [T]he Defendant claims that counsel was ineffective for failing to obtain information concerning the original or replacement value of the television, which the Defendant contends was sold by retailers for $797.00 around the date the victim claimed to have received it. He asserts that had counsel investigated the actual retail price of the television, he would have been able to obtain proof that it costs less than $1000.00. The Defendant contends that had counsel obtained this information and presented it during trial, it would have changed the outcome of his motion

for judgment of acquittal. The State was directed to respond to this claim.

In its response, the State contends that counsel was not deficient and the Defendant was not prejudiced because had counsel provided documentation that the television was worth $799 at the time of the offense, the jury would have easily combined that worth with the damage to the other property caused by the Defendant and found him guilty of felony criminal mischief.

. . . [B]ecause the Defendant was charged with felony criminal mischief specifically relating to the damage to the television, the Court is not persuaded by the State's argument that the jury could easily have totaled all of the damage to the victim's property to an amount over $1,000. The Court notes that although the Defendant attaches to his motion an article indicating that a Sony Bravia LCD television costs around $799, the article specifically mentions that price in connection with a thirty-two inch television. As there is no evidence as to the size of the victim's Sony Bravia LCD television, it is entirely speculative that her television was the same size as that advertised in the Defendant's article clipping. Pure speculation cannot form the basis for postconviction relief. *Johnson v. State*, 921 So. 2d 490, 503–04 (Fla. 2005); *Solorzano v. State*, 25 So. 3d 19, 23 (Fla. 2d DCA 2009). Accordingly, this claim is denied.

Attached to Moore's post-conviction motion was an article from Consumer Reports News stating that a 32-inch Sony Bravia television cost $797.00 at Target and $767.00 at Wal-Mart. (Doc. 11-7 at 63) At trial, the victim presented no testimony about the size of her television. (Doc. 11-3 at 51–53, 98–100) The prosecution introduced into evidence a photograph of the victim's television but the photograph lacked any indication whether the screen on the television was 32 inches. (Doc. 11-2 at 160) No other evidence proves the size of the screen. Consequently, the state court neither unreasonably determined that Moore's claim was speculative nor unreasonably applied *Strickland*. *Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."); *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001)

("Johnson offers only speculation that the missing witnesses would have been helpful. This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'") (citation omitted). Ground Three is denied.

**Ground Four**

Moore asserts that trial counsel was ineffective for not objecting to the jury verdict form. (Doc. 1 at 14–15) He contends that the verdict form for the burglary charge failed to require the jury to find that Moore both committed a battery during the burglary and committed the burglary in a dwelling. (Doc. 1 at 14–15) The post-conviction court denied the claim as follows (Doc. 11-7 at 162–64) (state court citations omitted):

> [T]he Defendant claims that counsel was ineffective for failing to object to the jury receiving a verdict form that did not conform to the instruction given as to the burglary charge, count one. He contends that the Court charged the jury properly as to this count, instructing that if the jury found the Defendant guilty of burglary, it had to then determine whether the Defendant battered any person in the course of the burglary and whether the structure entered was a dwelling. However, he argues that counsel failed to object to the verdict form for count one, which included selections for guilty of burglary as charged, guilty of battery as included, and not guilty, which he argues did not conform to the jury instructions given because it did not include the jury's specific findings supporting the enhanced penalty for burglary with a battery. The Defendant asserts that the jury's verdict only supports a conviction of simple burglary and that, because of counsel's deficient performance, he was adjudicated guilty of a more severe felony and sentenced to a harsher penalty than allowed by law.
>
> . . .
>
> [A]lthough the Defendant has stated a facially sufficient claim, the Court finds this claim to be without merit. The Defendant was charged in count one with burglary with a battery. The trial transcript indicates that the jury was specifically instructed that, if they found the Defendant guilty of burglary, they "must also determine if the State has proved beyond a reasonable doubt whether, in the course of committing the burglary, [the

Defendant] battered any person." The Court then instructed the jury that if they do not find that the Defendant "committed the main crime of which he is accused, there may be evidence that he committed" a lesser included crime, and instructed the jury on the lesser included crime of battery. Additionally, the jury verdict form allowed the jury to find the Defendant "guilty of BURGLARY, as charged," "guilt[y] of BATTERY, as included," or not guilty. Thus, it was clear that the jury found the Defendant guilty of burglary with a battery, as was charged.

Moreover, there was substantial evidence presented at trial of multiple batteries that were committed during the course of the burglary. The victim testified at trial that the Defendant forced his way into her home, repeatedly punched, kicked, and stomped her, cut her ponytail off with a pocket knife, and then forcibly penetrated her vagina and anus with his penis against her will. There was also testimony at trial by the initial responding officer, the detective [who] met the victim at the hospital, the sexual assault nurse examiner who examined the victim, and the treating emergency room physician describing the victim's injuries and photographs admitted into evidence documenting her injuries. In light of the evidence introduced at trial that the Defendant committed a battery during the course of the burglary, the jury instruction as to such a finding, and the two independent sexual battery convictions, the Court finds that the record demonstrates beyond a reasonable doubt that a rational jury would have found that the Defendant committed a battery during the course of the burglary, thus supporting the enhancement of the burglary charge to a first-degree felony punishable by life pursuant to section 810.02, Florida Statutes. Accordingly, the Defendant fails to demonstrate how he was prejudiced and this claim is therefore denied.

The information charged Moore with burglary with a battery. (Doc. 11-2 at 24) The

verdict form presented the charge as follows (Doc. 11-2 at 65):

We, the Jury, find as follows as to the defendant in this case: (check only one)

( )   A.          The defendant is guilty of BURGLARY, as charged.

( )   B.          The defendant is guilty of BATTERY, as included.

      ( )    C.            The defendant is not guilty.

The trial court instructed the jury on the charge as follows (11-3 at 405–07):

> To prove the crime of burglary, the State must prove the following three elements beyond a reasonable doubt:
>
> 1.    Andreau Moore entered a dwelling owned by or in the possession of [K.D.].
>
> 2.    At the time of the entering [into] the dwelling, Andreau Moore had the intent to commit battery in that dwelling.
>
> [3.]    Andreau Moore was not invited to enter the dwelling. The premises were not open to the public at the time of the entering.
>
> . . .
>
> Even though an unlawful entering of a dwelling is proved, if the evidence does not establish that it was done with the intent to commit battery, the defendant must be found not guilty.
>
> If you find Andreau Moore guilty of burglary, you must also determine if the State has proved beyond a reasonable doubt whether, in the course of committing the burglary, Andreau Moore battered any person. A battery is an actual and intentional touching or striking of another person against that person's will or the intentional causing of bodily harm to another person.
>
> If you find Andreau Moore guilty of burglary, you must also determine if the State has proved beyond a reasonable doubt whether the structure entered was a dwelling.
>
> Dwelling means a building or conveyance of any kind, whether such building or conveyance is temporary or permanent, mobile or immobile, which has a roof over it and is designed to be occupied by people lodging therein at night, together with the enclosed space of ground and outbuildings immediately surrounding it. For purposes of burglary, a dwelling includes an attached porch or attached garage.

The jury marked the verdict form as follows (Doc. 11-2 at 65):

> We, the Jury, find as follows as to the defendant in this case: (check only one)

( X )   A.     The defendant is guilty of BURGLARY, as charged.

( )     B.     The defendant is guilty of BATTERY, as included.

( )     C.     The defendant is not guilty.

A jury is presumed to follow the instructions. *Evans v. Michigan*, 568 U.S. 313, 328 (2013). The jury verdict form required the jury to determine whether Moore was guilty of burglary "as charged." (Doc. 11-2 at 65) The information charged Moore with burglary with a battery. (Doc. 11-2 at 24) The trial court instructed the jury to determine whether Moore both entered a structure that was a dwelling and committed a battery during the burglary. (Doc. 11-3 at 406) The trial court did not instruct the jury on any lesser offense of burglary, such as burglary with the intent to commit some other offense. Consequently, the state court did not unreasonably determine that the record refutes Moore's claim.

Even if trial counsel deficiently performed by not requesting interrogatories on the verdict form for findings that Moore both entered a structure that was a dwelling and committed a battery during the burglary, Moore could not demonstrate prejudice under *Strickland*. Unrefuted evidence at trial proved both. Photographs proved that the structure where the burglary occurred was a dwelling — the victim's home. (Doc. 11-2 at 156, 159, 162–73) Other photographs — and Moore's own testimony — proved that Moore physically injured the victim after he entered the victim's home. (Docs. 11-2 at 175–89 and 11-3 at 298–99) Also, the jury found Moore guilty of sexual battery (Doc. 11-2 at 66), and the evidence proved that Moore sexually battered the victim in the victim's bedroom. (Doc. 11-7 at 210–17) Even if trial counsel had requested the interrogatories for the verdict form, the

outcome at trial would not have changed. Consequently, the state court did not unreasonably apply *Strickland*. *Strickland*, 466 U.S. at 694. Ground Four is denied.

**Ground Five**

Moore asserts that trial counsel was ineffective for not objecting to a comment by the prosecutor during *voir dire* about reasonable doubt. (Doc. 1 at 16) ("Sub-claim A") He further asserts that trial counsel deficiently performed by misconstruing the definition of reasonable doubt during *voir dire*. (Doc. 1 at 16–17) ("Sub-claim B")

**Sub-claim A**

Moore asserts that trial counsel should have objected when the prosecutor gave an example of reasonable doubt to potential jurors during *voir dire*. (Doc. 1 at 16) The prosecutor asked a potential juror about the following example (Doc. 11-2 at 327–28):

| [Prosecutor:] | The burden of proof, we have the burden of proving this case beyond a reasonable doubt, and beyond a reasonable doubt is a very abstract term, which is why I'm [going to] give this extremely silly example just to kind of put it in perspective. |
|---|---|
| | If I told you I lived right by Stetson down [in] Gulf Port and this morning I thought, you know what, it's not raining. It's a little chilly so I could use a really good walk up to the Criminal Justice Center this morning to go to my office which is at the end of this hall, is that reasonable that I would get up and do that? |
| [Juror:] | No. |
| [Prosecutor:] | Is it possible though, if I got up early enough, if I brought a change of heels, if I showered when I got here? Is it possible though? |
| [Juror:] | It's possible. |

[Prosecutor:]    Okay. That was just the point I'm just trying to illustrate. We have to prove this case beyond a reasonable doubt, not beyond all possible doubt. Because like everyone says, anything is possible, but what is important here is what is reasonable.

The post-conviction court denied the claim as follows (Doc. 11-7 at 164–65) (state court record citations omitted):

[T]he Defendant claims that counsel was ineffective for failing to object to the State paraphrasing the reasonable doubt standard during *voir dire*. He asserts that the definition for reasonable doubt should never deviate from the standard jury instruction, and that counsel's failure to object to the State's paraphrasing deprived him of a defense.

The Court previously struck this claim as being facially insufficient because Defendant failed to allege prejudice. In his amended motion, the Defendant alleges that had counsel objected to the State paraphrasing the reasonable doubt standard during *voir dire*, the sitting jury would have understood the reasonable doubt standard and the outcome of the trial would have been different.

This claim is without merit because counsel was not deficient and the Defendant was not prejudiced. The State's statement that it has to "prove this case beyond a reasonable doubt, not beyond all possible doubt" is an accurate explanation of the reasonable doubt standard. *See* Fla. Std. Jury Instr. (Crim.) 3.7. Therefore, counsel was not deficient because the State's explanation was not objectionable. Moreover, the Court recited verbatim the standard jury instruction on reasonable doubt during the jury charge. Thus, the jury was aware of the proper definition for reasonable doubt and the Defendant was not prejudiced. Therefore, this claim is denied.

At the close of evidence, the trial court instructed the jury on reasonable doubt as follows (Doc. 11-7 at 289):

[Court:]    Whether the words "reasonable doubt" are used, you must consider the following: A

37

> reasonable doubt is not a mere possible doubt, a speculative, imaginary or forced doubt. Such a doubt must not influence you to return a verdict of not guilty if you have an abiding conviction of guilt. On the other hand, if after carefully considering, comparing and weighing all the evidence, there is not an abiding conviction of guilt, or, if, having a conviction, it is one which is not stable but one [which] wavers and vacillates, then the charge is not proved beyond every reasonable doubt and you must find the defendant not guilty because the doubt is reasonable.

The trial court's instruction tracked the standard instruction. Fla. Std. Jury Instr. (Crim.) 3.7. The jury is presumed to have followed the instruction. *Evans*, 568 U.S. at 328. The prosecutor's comment during *voir dire* that the prosecution had to prove "this case beyond a reasonable doubt, not beyond all possible doubt" accurately explained reasonable doubt. (Doc. 11-2 at 327–28) Because an objection to the prosecutor's comment would not have succeeded and a successful objection would not have changed the outcome at trial, the state court did not unreasonably apply *Strickland*. *Strickland*, 466 U.S. at 694; *Pinkney*, 876 F.3d at 1297.

**Sub-claim B**

Moore asserts that trial counsel deficiently performed by misconstruing the definition of reasonable doubt during *voir dire*. (Doc. 1 at 16–17) Trial counsel had the following exchange with a potential juror (Doc. 11-2 at 349–51):

> [Trial counsel:]     . . . Beyond a reasonable doubt is the standard, and that's the highest standard in the law. You don't have any higher standard than beyond a reasonable doubt. That okay with you?

[Juror Murray:]      Yeah.

[Trial counsel:]      Okay with everybody else? One of the things that is kind of interesting in the law and criminal courts is that the judge is [going to] tell you what a reasonable doubt is, but ultimately it's [going to] be up to you to decide what it is. She'll give you guidelines, but I'm always worried that people listening to the facts and the evidence will not, in fact, take this as seriously as the legal system presumes that they will.

. . .

[Trial counsel:]      So you're [going to] hold [the prosecutors] to prove [ ] each and every element to the point where there is no question in your mind, is that right?

[Juror Harvey:]      Uh-huh.

[Trial counsel:]      Okay. Fair enough. How about you, Ms. Cruz?

[Juror Cruz:]      Well, I agree we just have to listen carefully to the evidence, whatever it is, and what the witnesses say, listen very carefully and then weigh that in.

[Trial counsel:]      Okay. Do you believe that proof beyond a reasonable doubt is a real high burden?

[Juror Cruz:]      No.

[Trial counsel:]      Why not?

[Juror Cruz:]      Because sometimes I think it's impossible to have more. There is no camera filming the crime. So it's impossible to have 100 percent verification of everything.

[Trial counsel:]      Okay. If I told you in the law beyond a reasonable doubt is the highest burden of

|                   | proof that there is, would you believe that I'm telling you the truth? |
| [Juror Cruz:]     | Yes. |
| [Trial counsel:]  | Okay. And, in fact, I am telling you the truth. Don't you think you should be pretty sure that the State's proven an element? |
| [Juror Cruz:]     | Yes. |
| [Trial counsel:]  | Okay. So pretty sure is good? |
| [Juror Cruz:]     | Yes. |

The post-conviction court denied the claim as follows (Doc. 11-7 at 165–66) (state court record citations omitted):

> [T]he Defendant claims that counsel was ineffective for discounting the importance of the reasonable doubt standard by "informing the venire that even though 'the judge is gonna tell [them] what a reasonable doubt is,' it's 'ultimately gonna be up to [them] to decide what it is.'" He further indicates that counsel elicited a statement from a prospective juror that if they were "pretty sure" that the State had proven an element of the crime, that it was sufficient for the State to meet its burden of proof. The Defendant asserts that counsel's minimization of the reasonable doubt standard deprived him of a defense.

> The Court previously struck this claim as being facially insufficient because the Defendant failed to allege prejudice. In his amended motion, the Defendant alleges that had counsel not made statements discounting the importance of the reasonable doubt standard during *voir dire*, the sitting jury would have understood the reasonable doubt standard and the outcome of the trial would have been different.

> This claim is without merit because counsel was not deficient and the Defendant was not prejudiced. When taken in context, counsel was merely polling the prospective jury panel as to what beyond a reasonable doubt meant to several of the individual prospective jurors. Questioning the potential jurors about their understanding of reasonable doubt neither defines reasonable doubt nor implies a standard lower than reasonable doubt. Accordingly, counsel was not deficient for failing to object

> because there was nothing to object to. Moreover, the
> prospective juror who indicated that beyond a reasonable doubt
> meant "pretty sure" to her was not a member of the sitting jury
> panel in the Defendant's trial. Additionally, the Court notes that
> all of the cases cited by the Defendant involve instances where
> the trial court erroneously defined or instructed the jury on the
> reasonable doubt standard. That was not the case in the
> Defendant's trial. Rather, . . . the Court recited verbatim the
> standard jury instruction on reasonable doubt during the jury
> charge in the Defendant's case. Therefore, the Defendant was
> not prejudiced. Accordingly, this claim is denied.

Juror Cruz — who agreed with trial counsel's comment that reasonable doubt meant "pretty sure" — served on the jury. (Docs. 11-2 at 380 and 11-7 at 199–200) Even though the state court unreasonably determined that "the prospective juror who indicated that beyond a reasonable doubt meant 'pretty sure' to her was not a member of the sitting jury panel in [Moore's] trial" (Doc. 11-7 at 166), the claim is for relief on that basis fails under *de novo* review. *Cooper v. Sec'y, Dep't Corrs.*, 646 F.3d 1328, 1353 (11th Cir. 2011) ("When a state court unreasonably determines the facts relevant to a claim, 'we do not owe the state court's findings deference under AEDPA,' and we 'apply the pre–AEDPA *de novo* standard of review' to the habeas claim.") (citation omitted).

Trial counsel appropriately asked potential jurors questions about reasonable doubt. *State v. Murray*, 262 So. 3d 26, 44 (Fla. 2018) ("'The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court.'") (citation omitted)). Juror Cruz agreed that "in the law beyond a reasonable doubt is the highest burden of proof that there is." (Doc. 11-7 at 199)

During *voir dire*, the trial court asked whether all jurors understood that the prosecution carried the burden to prove guilt "beyond and to the exclusion of every reasonable doubt."

(Doc. 11-2 at 293) The jurors collectively agreed that they could follow the law and hold the prosecution to "that burden which is proof beyond every reasonable doubt." (Doc. 11-2 at 293) Referring to "reasonable doubt" the trial court explained, "And that's a legal term and it will be explained more fully to you later." (Doc. 11-2 at 293) At the end of trial during the final charge, the trial court defined reasonable doubt (Doc. 11-7 at 289), and the instruction tracked the standard instruction. Fla. Std. Jury Instr. (Crim.) 3.7. The trial court instructed the jury to follow the jury instructions to return a lawful verdict and cautioned, "If you fail to follow the law, your verdict will be a miscarriage of justice." (Doc. 11-3 at 415)

Juror Cruz is presumed to have followed the trial court's instruction on reasonable doubt. *Evans*, 568 U.S. at 328. *Ingram v. Zant*, 26 F.3d 1047, 1053 (11th Cir. 1994) ("Because we presume that jurors follow such instructions, we must assume that the jury put aside any biases it may have had, applied the legal standards as enunciated in the jury instructions, and based its sentencing decision solely on the facts introduced at trial and sentencing."); *United States v. Miller*, 758 F.2d 570, 573 (11th Cir. 1985) ("We conclude that the overall *voir dire* questioning, coupled with the instructions given by the trial court at the close of the case, adequately protected appellant Miller's right to be tried by a fair and impartial jury."). Even if counsel's statement may have initially confused a juror. The trial court made abundantly clear what the standard of proof was, and Moore cannot demonstrate the outcome at trial would have changed if his counsel had not made the challenged statement. Hence, the claim of ineffective assistance of counsel on this basis fails. *Strickland*, 466 U.S. at 694. Ground Five is denied.

**Ground Six**

Moore asserts that trial counsel was ineffective for not moving to strike the jury venire

because potential jurors made prejudicial comments during *voir dire*. (Doc. 1 at 18–20) Moore contends that trial counsel should have moved to strike the venire because of the following comments by potential jurors (Doc. 1 at 19):

- Juror Kerwood said in the presence of the venire:

  | [Juror:] | The charge itself of the sexual battery, it's disgusting, and I think that it should — it's gross, man. It's disgusting, and just the charge itself against somebody like that is just — in my mind it's just one of those guilty or innocent things. And if he did it, then I think his thing should be chopped off. |

  (Doc. 11-2 at 270)

- Juror Town said in the presence of the venire that he could not be impartial because his wife was "previously sexually brutalized" by her ex-husband.

  (Doc. 11-2 at 271)

- Juror Smith said in the presence of the venire:

  | [Juror:] | I'll tell you why. I respect the courts. Trust me. I was born down here. And there's no way you can forgive somebody that sex[ually] assaults a woman. Personally if I could speak my truth, I'd get in trouble. I would turn him into a female. I'll put it that way. There is no — you know and I know it's no excuse for that. You know, I feel sorry for the victim. I really do. |

  (Doc. 11-2 at 271–72)

- Juror Hynds said in the presence of the venire that she could not be impartial because she "was sexually assaulted when [she] was a teenager."

(Doc. 11-2 at 273)

- Juror Hager said in the presence of the venire that she could not be impartial because her mother was in an abusive relationship and Hager witnessed the physical abuse. Photographs of the beaten victim would disturb Hager.

(Doc. 11-2 at 354)

- Juror Roberts described in the presence of the venire how he used to intervene between his sister and her boyfriend, because her boyfriend used to beat her up. Roberts explained:

|            |            |
|------------|------------|
| [Juror:]   | My sister — my sister, she finally did decide to let him go and she — you know, from us talking to her. But, I mean, we used to always come over there. She would call us. Me or my brother, we always had to come over there and get in between him or threaten him to go home or whatever and, you know, and leave her alone. So, I mean, it always bothered me that how can he do that to her as much as she did for him. Like, she let him live in her house and all that other stuff. You know, I mean, I just never understood that one. |

(Doc. 11-2 at 355–56)

- Juror Smith said in the presence of the venire:

|                   |                                              |
|-------------------|----------------------------------------------|
| [Juror:]          | I told you the guy's guilty. That's it.      |
| [Trial counsel:]  | Well, thank you sir.                         |
| [Juror:]          | I spent years in Vietnam. I [have] seen all this [ ] on the river gunboats[,] sexual assaults. It's still in my mind. |
| [Trial counsel:]  | Okay. I understand that, sir. Thank you for that. Your |

> position has [been] made real clear, and we appreciate your honesty about that, but now I'm trying to talk to Ms. [G.] about it.

[Juror:]   I just — what do you want to do? I just don't want — I'm [going to] plead him guilty any way you look at it.

(Doc. 11-2 at 363–64)

The post-conviction court denied the claim as follows (Doc. 11-7 at 166–67):

> The Defendant claims that counsel was ineffective for failing to move to strike the jury panel based on comments made by prospective jurors [ ]. Specifically, the Defendant alleges that these prospective jurors demonstrated that they could not be fair and impartial based on the charge of sexual battery in this case, and that this sentiment flowed over to the jury panel as a whole. He alleges that counsel had an obligation, in light of the representation[s] of these nine veniremen, to *voir dire* the entire panel on this subject to determine if the rest of the panel was of the same disposition.
>
> The Court previously struck this claim for being facially insufficient because the Defendant failed to allege prejudice. In his amended motion, the Defendant alleges that counsel[ ] fail[ed] to adequately *voir dire* the rest of the jury panel and move to strike the entire panel, [and] the "outcome may well have been different if a fair and impartial jury could have been selected."
>
> This claim is without merit because the Defendant has failed to demonstrate how the exposure of other venire members' opinions affected the outcome of the case. In order for the statement of one venire member to taint the panel, the venire member must mention facts that would not otherwise be presented to the jury. *See Pender v. State*, 530 So. 2d 391 (Fla. 1st DCA 1988); *Wilding v. State*, 427 So. 2d 1069 (Fla. 2d DCA 1983). The Defendant does not allege that a venire member in his case mentioned a fact that would not otherwise be presented to the jury. A venire member's expression of an opinion before the entire panel is not normally considered sufficient to taint the remainder of the panel. *Brower v. State*, 727 So. 2d 1026, 1027 (Fla. 4th DCA 1999). Thus, the fact that other venire members

expressed their inability to be impartial does not show that the Defendant was prejudiced by the failure of counsel to request individual *voir dire*. Nor would a motion to strike the venire have been meritorious. Therefore, the Defendant's claim is speculative. Pure speculation cannot form the basis for postconviction relief. *Johnson v. State*, 921 So. 2d 490, 503–04 (Fla. 2005); *Solorzano v. State*, 25 So. 3d 19, 23 (Fla. 2d DCA 2009). Accordingly, this claim is denied.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). However, "[t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. at 723. *Skilling v. United States*, 561 U.S. 358, 386 (2010) ("No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*. Jury selection, we have repeatedly emphasized, is 'particularly within the province of the trial judge.'") (citations omitted).

In his petition, Moore asserts that comments by Jurors Kerwood, Town, Smith, Hynds, Hager, and Roberts tainted the venire. (Doc. 1 at 19) Neither of these six potential jurors served on the petit jury. (Doc. 11-7 at 200)

Also, the trial court explained that the potential jurors' comments served to identify those jurors who could be neither fair nor impartial as follows (Doc. 11-2 at 264–66):

[Court:]          Ladies and gentleman, at this time the Court, counsel for the State and counsel for the defendant will be asking you questions to help us decide which of you will serve as jurors in this case. The questions are asked to determine if your decision in this case might be influenced by some personal experience or special knowledge that you have concerning the subject of this trial, the

parties, witnesses or attorneys, or by opinions that you now hold.

It is not unusual for people to have strong feelings about certain subjects or to identify with or feel some partiality toward one side or the other; however, it would be a violation of your oath as prospective jurors to fail to answer truthfully and completely these questions about these matters.

. . .

Please understand that these questions are not meat to embarrass you or to pry into your personal affairs. They are intended to obtain a fair and impartial jury to try this case. It is your duty to answer completely and truthfully all of the questions that will be asked of you. Any failure to answer truthfully and completely may require this case to end in a mistrial or to be tried again.

When the trial judge asked the potential jurors whether strong feelings about the charges against Moore rendered them unable to act fair and impartial as a juror, the trial court further instructed (Doc. 11-2 at 272, 274):

[Court:]          And before I go on, let me just say — I usually say this later, but I'll say it now. There are no wrong answers here. This isn't a test of you. What we need to find out [if there] are things about [how] you feel. This is one topic that we're [going to] address among many, and I just want you to know that you can say whatever you want to say really. You can. We don't care. We've heard it all before. So feel free to speak your mind, and we appreciate that so that we can get a fair and impartial jury to try this case. So don't be shy. Feel free to speak up.

. . .

> You've just heard the charges. And so, you
> know, your job as a juror would be to wait
> and listen to the evidence that's presented
> and then the law that I would give you and
> apply the evidence that's presented to the
> law and then make a decision and do that
> fairly and impartially.
>
> . . .
>
> And I — you know, sometimes jurors hear
> the charges and they feel that way at first,
> but as they sit and some time passes and
> they hear more about the law from me and
> they hear the attorneys questions, their
> mind starts to change and they realize that
> they do believe they can be fair and
> impartial. So I want you all to keep that in
> mind and I ask you just to keep an open
> mind, and then we'll come back to you
> again and give you some time to process all
> of this and give us an answer.

None of the jurors who served on the petit jury (Docs. 11-2 at 380 and 11-3 at 422)

responded that he or she could not act fairly and impartially because of the nature of the

charges. (Doc. 11-2 at 269–81) The trial court's additional instructions ensured that the

potential jurors' comments did not taint the jurors who served. Because Moore failed to

demonstrate actual bias held by any juror who served, the state court did not unreasonably

determine that only speculation supported the claim. *United States v. Guzman*, 450 F.3d 627,

630 (6th Cir. 2006) ("General statements about crime, the criminal justice system, and even

the crimes charged are of no constitutional concern . . . . Nor is there a problem when

potential jurors announce their potential biases.") (citations omitted); *United States v. Tegzes*,

715 F.2d 505, 507 (11th Cir. 1983) ("The constitutional standard of fairness requires that the

criminally accused have 'a panel of impartial, indifferent jurors.' However, jurors need not

be totally ignorant of the consequences of crime, nor free of opinion towards crime.")

(citations omitted); *United States v. Lacey*, 86 F.3d 956, 969 (10th Cir. 1996) ("While it is true that the three excused jurors demonstrated some degree of bias against a defendant who would not testify, the partiality of the petit jury is evaluated in light of those persons ultimately empaneled and sworn, not those who are excused from service."). Ground Six is denied.

**Ground Seven**

Moore contends that trial counsel was ineffective for not impeaching the victim with prior inconsistent statements about how the crimes occurred ("Sub-claim A") and for not calling Dianne Lane and Tara Wagner to testify at trial to impeach the victim. ("Sub-claim B") (Doc. 1 at 21–22)

**Sub-claim A**

Moore asserts that trial counsel deficiently performed by not impeaching the victim with her inconsistent statements about how the crimes occurred. (Doc. 1 at 21) At trial, the victim testified that Moore had undressed her before he raped her. (Doc. 1 at 21) Moore contends that the victim told a police officer that she removed her own clothes and testified at a bond hearing that Moore made her get undressed. (Doc. 1 at 21) The post-conviction court denied the claim as follows (Doc. 11-7 at 167–68) (state court record citations omitted):

> [T]he Defendant claims that counsel was ineffective for failing to impeach the victim's trial testimony with her prior inconsistent statements regarding whether the Defendant forcibly removed her clothes or she removed them herself. The Defendant indicates that defense counsel attempted to impeach the victim, but that because he did not have the victim's prior inconsistent statements, the State's objection was sustained. He further asserts that, but for counsel's omission, the result of the proceeding would have been different. The Defendant asserts that the victim's credibility "was the very foundation of the

State's case," and that had counsel attacked her credibility, "the jury could have easily accepted [his] version of events that their having sex was consensual."

The Court previously found this claim to be facially sufficient and reserved ruling on this subclaim until the Defendant filed an amended motion or until the time allotted to him to do so expired.

This claim is without merit as counsel was not deficient and the Defendant was not prejudiced. Initially, the Court notes that during cross-examination of the victim at trial, counsel did have the police reports and the deposition containing the alleged prior inconsistent statements. Only the investigating officers notated or previously testified that the victim indicated to them that she removed her own clothes. The victim, however, consistently testified that it was the Defendant who removed her clothing. Moreover, the reason the trial court sustained the State's objection to defense counsel's improper impeachment with the police report was because the information contained in police reports is considered hearsay and is thus inadmissible at trial. *See Burgess v. State*, 831 So. 2d 137, 140 (Fla. 2002). Nevertheless, counsel still managed to impeach the victim with many prior inconsistent statements that the victim had made to the investigating officers; and, counsel reiterated the victim's inconsistent statements during closing argument. Accordingly, counsel would have been unable to impeach the victim with statements contained in any arrest affidavits or police reports and the victim otherwise testified consistently as to who removed her clothing. Thus, counsel was not deficient in this respect.

Even if counsel would have been able to impeach the victim with statements documented by law enforcement officers, the Court finds that counsel's failure to impeach the victim on the detail of whether the Defendant removed the victim's clothes or whether the victim removed her own clothes to be slight in comparison to the many other inconsistencies with which he was able impeach the victim. Therefore, the Court finds that the Defendant was not prejudiced. As counsel was not deficient and the Defendant was not prejudiced, this claim is denied.

At trial, the victim testified that Moore undressed her before he raped her. (Doc. 11-3 at 57) At the bond hearing, the victim testified, "But he took me to the bedroom and he's like, oh, you know, can we have sex, and I said, no, I don't want to. And he still pushed

me on the bed and like and made me get undressed." (Doc. 11-7 at 68) At a deposition a

detective testified (Doc. 11-7 at 69):

| [Detective:] | [The victim] said she was wiping the blood off her face when [Moore] entered the bedroom, informed her that he wanted to have sex with her. She said she did not want to have sex. He told her she was to get naked. She was afraid he still had the knife and eventually was going to use it, she complied and took her clothes off. |
|---|---|

Trial counsel did impeach the victim with her inconsistent statement to police at trial.

On cross-examination of a police officer, the officer testified as follows (Doc. 11-3 at 127):

| [Trial counsel:] | Officer, [the victim] led you to believe that she only had intermittent contact with Andreu Moore, right? |
|---|---|
| [Officer:] | Yes, she — yes. |
| . . . | |
| [Trial counsel:] | Did [the victim] take her own clothes off, according to her? |
| [Officer:] | I believe she advised that he had a knife at that time, and in fear she did take her — remove her own clothing. |

Moore used the knife to cut off the victim's hair and ran the knife along his arms threatening

to kill himself before telling the victim, "I'm at least going to get a nut before I die," dragging

her into her bedroom, forcing her onto her bed, and raping her. (Doc. 11-3 at 55–60) It is

effective strategy to impeach a witness with the statement of another as to inconsistent

statements previously made by the witness. It is not necessary, and sometimes ill-advised, to

inquire of the witness herself, as she might try to cure the or correct the inconsistency in the

statements. As such, counsel was not deficient in impeaching the witness/victim in this

indirect manner.

Also, trial counsel thoroughly impeached the victim with the other more critical inconsistent statements. (Doc. 11-3 at 93, 99–101, 103, 108, 110–11, 112–13). Still Moore was convicted. Thus, even if trial counsel had impeached the victim directly with the single inconsistent statement, Moore has not demonstrated that the outcome at trial would have changed. *Strickland*, 466 U.S. at 694. Consequently, the state court did not unreasonably apply *Strickland*.

**Sub-claim B**

Moore asserts that trial counsel deficiently performed by not calling Dianne Lane and Tara Wagner to testify at trial and impeach the victim. (Doc. 1 at 22) He contends that both would have testified that (1) the victim told them that she falsely accused her brother-in-law of rape when she became angry at him and (2) the victim was not forthcoming with her family about living with Moore. (Doc. 1 at 22) The post-conviction court denied the claim as follows (Doc. 11-8 at 53–54) (state court record citations omitted):

> The Defendant claims that counsel was ineffective for failing to call witnesses who would have "[cast] doubt on her credibility or demonstrated that she had a reputation for dishonesty." When a defendant alleges that counsel was ineffective for failing to investigate or call a witness to testify at trial, in addition to the *Strickland* requirements, a defendant must sufficiently allege: (1) the identity of the prospective witness; (2) the substance of the witness's testimony; (3) how omission of the testimony prejudiced the outcome of the trial; and (4) that the witness was available to testify. *Barthel v. State*, 882 So. 2d 1054, 1055 (Fla. 2d DCA 2004) (citing *Nelson v. State*, 875 So. 2d 579, 583–84 (Fla. 2004)). Additionally, the defendant must allege that he advised counsel of such a witness. *See Prieto v. State*, 708 So. 2d 647, 649 (Fla. 2d DCA 1998).
>
> The Defendant claims that counsel should have called Dianne

Lane, the Defendant's mother, and Tara Wagner, the Defendant's sister, as witnesses for the defense. The Defendant alleges that both of these witnesses would have testified that the victim told them that she had previously falsely accused her brother-in-law of rape because she was mad at him. The Defendant further asserts that the victim "had been lying to her family for six years about her and [the] Defendant living together." He alleges that the basis of the testimony of these witnesses would have been whether they knew the reputation of the victim for truth and veracity in the community. He alleges that had counsel called these witnesses to testify as he alleges they would have, it would have impeached the victim's credibility and the result of the proceeding would have been different. The Defendant further alleges that he advised his counsel of these witnesses and that they were available to testify at trial. He claims that had the jury been made aware of the victim's propensity to be untruthful, her credibility would have been called into doubt and the jury would have believed his testimony that the sexual intercourse was consensual. The State was directed to respond to this claim.

In its response, the State contends that counsel was not deficient and the Defendant was not prejudiced. Specifically, the State argues that neither or these witnesses would have been able to testify about the prior false allegation of rape because that testimony would not have been admissible. The State further argues that testimony by these witnesses that the victim lied to her family about the Defendant living with her would have been inadmissible hearsay. Moreover, the State contends that the Defendant was not prejudiced because the jury was made aware of the situation that the Defendant lived with the victim and lied to her family.

The Court finds that counsel was not deficient and the Defendant was not prejudiced. The Court agrees with the State that the prior false allegations of rape would not have been admissible. *See Pantoja v. State*, 59 So. 3d 1092, 1097 (Fla. 2011) (holding that sections 90.610, 90.608(2), and 90.405(2) do not permit impeachment of a witness with evidence of prior accusations of molestation by the victim that were either false or that did not result in a criminal conviction). Additionally, the Court agrees with the State that the Defendant was not prejudiced by counsel's failure to have these witnesses testify as to the victim lying to her family about her and the Defendant living together. Both the victim and the Defendant explained to the jury that the victim had hid from her parents the fact that the Defendant had lived

with the victim in the past. Accordingly, testimony to this effect
would have been cumulative and would have had no effect on
the outcome of the trial. This claim is denied.

Under state law, a victim's prior false accusation against another individual is not
admissible. *Pantoja v. State*, 59 So. 3d 1092, 1096–98 (Fla. 2011). A state court's determination
of state law receives deference in federal court. *Machin v. Wainwright*, 758 F.2d 1431, 1433
(11th Cir. 1985) ("The federal courts must defer to a state court's interpretation of its own
rules of evidence and procedure.").

However, a victim's prior false accusation against another person may still be
admissible to comply with the federal constitutional right to confront witnesses. *Davis v.
Alaska*, 415 U.S. 308, 316 (1974) ("A more particular attack on the witness' credibility is
effected by means of cross-examination directed toward revealing possible biases, prejudices,
or ulterior motives of the witness as they may relate directly to issues or personalities in the
case at hand."); *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) ("[A] criminal defendant states a
violation of the Confrontation Clause by showing that he was prohibited from engaging in
otherwise appropriate cross-examination designed to show a prototypical form of bias on the
part of the witness, and thereby to expose to the jury the facts from which jurors . . . could
appropriately draw inferences relating to the reliability of the witness.") (citations and internal
quotations omitted).

The prior false accusation must have more than minimal probative value and may not
attack the general credibility of the witness. *Pantoja*, 59 So. 3d at 1099–1100 ("Federal courts
have upheld exclusion of prior false accusation evidence against Sixth Amendment challenges
because the evidence was properly excluded under Federal Rule of Evidence 403.") (citations
omitted). *Accord United States v. Tail*, 459 F.3d 854, 860 (8th Cir. 2006) ("[I]n a sexual abuse

case, evidence alleging that the accuser made prior false accusations may be excluded if the evidence has minimal probative value. And the propriety of excluding such evidence is strengthened where the prior incident is unrelated to the charged conduct, and where the defendant intends to use the evidence as part of an attack on the 'general credibility' of the witness.") (citations omitted).

In his petition[1], Moore contends that his mother and sister would have testified that "they were told by the victim that she previously lied on her brother-in-law by falsely accusing him of rape because she was mad at him." (Doc. 1 at 22) In his reply, he further clarifies that "[t]he testimony that the victim had previously made a false accusation of forced sex against the brother-in-law tended to show the victim's bias, namely, that the victim was inclined to make false accusations when she was angry or wanted her way." (Doc. 14 at 22)

Moore failed to come forward with an affidavit or sworn testimony to show that the witnesses would have testified in the manner that he contends. *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) ("This prejudice burden is heavy where the petitioner alleges ineffective assistance in failing to call a witness because 'often allegations of what a witness would have testified to are largely speculative.'") (citations omitted). *Johnson*, 256 F.3d at 1186 ("[W]hen an attorney 'substantially impeache[s]' the witness, no claim for ineffectiveness can succeed unless the petitioner comes forward with 'specific information' which 'would have added to the impeachment of the State's witnesses.' . . . Johnson offers only speculation that the missing witnesses would have been helpful. This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'") (citations omitted).

---

[1] In his second amended Rule 3.850 motion, Moore failed to allege that the victim falsely accused her brother-in-law of rape. (Doc. 11-7 at 151) However, the Respondent concedes that the claim is exhausted. (Doc. 9 at 30)

*Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) ("[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative."); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (footnote omitted).

Even accepting the allegations as true, the probative value of the false accusation was weak. The false accusation was against the victim's brother-in-law — a family member, while the accusation in this case was against the victim's boyfriend with whom the victim had a six-year relationship. (Doc. 11-3 at 27) The false accusation allegedly arose because the victim was merely "mad" or "angry" at her brother-in-law, or "wanted her way." (Docs. 1 at 22 and 14 at 22) The accusation in this case arose after the victim's boyfriend repeatedly and admittedly punched her in the face, kicked her, pushed her shoulder through a wall, slashed her television with a pocket knife, and used the knife to cut off her hair. (Doc. 11-3 at 37–60) Moore failed to allege whether the victim reported the false accusation against the brother-in-law to police, while the victim immediately reported the accusation against Moore to police and underwent an examination by a sexual assault nurse. (Doc. 11-3 at 69–72, 184–93) Moore failed to allege whether DNA evidence corroborated the victim's accusation against her brother-in-law, while  DNA evidence corroborated the victim's accusation against Moore. (Doc. 11-3 at 219)

Because Moore failed to establish that the victim's accusation against the brother-in-

law was more than minimally probative of the victim's credibility, the state court did not unreasonably apply *Davis* or *Olden*. *Boggs v. Collins*, 226 F.3d 728, 745 (6th Cir. 2000) ("While Boggs sought to cross-examine Berman on an alleged false accusation of rape, he desired to do so to attack further her general credibility. Under *Davis* and *Van Arsdall*, that purpose alone does not implicate the Confrontation Clause."); *United States v. Bartlett*, 856 F.2d 1071, 1089 (8th Cir. 1988) ("[T]he evidence of the alleged prior false accusation of rape was offered solely to attack the general credibility of Janis. In addition, we agree with the district court that its probity in that regard is very weak. Accordingly, we hold that the district court properly refused to admit the evidence.").

*Secretary, Fla. Dep't Corrs. v. Baker*, 406 F. App'x 416 (11th Cir. 2010) is distinguishable. In *Baker*, the victim's prior false accusations were highly probative of her credibility related to the charges against the defendant. The minor victim had falsely accused three family members of having sex with her. 406 F. App'x at 424. The minor victim made the same accusation against the defendant, her brother-in-law. 406 F. App'x at 424. The minor victim made the accusations against the family members while she lived with them. 406 F. App'x at 424. The minor victim made the accusation against the defendant, her brother-in-law, while she lived with him. 406 F. App'x at 418. The minor victim had a pattern of moving in with a family member, accusing them of sexual misconduct, and leaving shortly after. 406 F. App'x at 424. The accusation against the defendant fit that pattern. Consequently, the court of appeals concluded that "[t]he evidence that [the minor victim] had habitually lied about sexual assaults by family members had 'strong potential to demonstrate the falsity of [her] testimony' in this case, and 'a reasonable jury might have received a significantly different impression of [her] credibility had defense counsel been permitted to pursue his proposed line of cross-

examination.'" 406 F. App'x at 424. Because Moore failed to establish any strong probative connection between the victim's false accusation against her brother-in-law and her accusation against Moore, the state court did not unreasonably apply clearly established federal law by excluding evidence of the false accusation. (Doc. 11-8 at 53–54)

Lastly, even if Moore's mother and sister had testified that the victim "had been lying to her family for six years about her and [the] Defendant living together," Moore testified about the same as follows (Doc. 11-8 at 201, 205–06):

| [Trial counsel:] | Okay. Well, now you mentioned that you had to move out because her parents were coming? |
|---|---|
| [Moore:] | Right. |
| [Trial counsel:] | What did you mean by that? |
| [Moore:] | Her parents — originally her mom knew I moved in with her at Hudson Point. That was the first place we lived and — but I was only supposed to be there for a little bit, you know, and then we just hid it, you know, forever. Her mom found out a couple times, and then — |
| [Trial counsel:] | Katelyn's parents are kind of well to-do? |
| [Moore:] | Yeah. They pick up the tabs for these town houses and stuff and — you know what I mean? They fund — that's why she — all she does is go to school now. She was just doing — when I met her just working just for something to do. |

. . .

| [Trial counsel:] | And they didn't approve of you? |
|---|---|
| [Moore:] | No. I only met her mom once. |
| [Trial counsel:] | Okay. And, in fact, when you were trying |

> to get — what did you do to get at Katelyn
> one time or two times when you were
> angry with her in terms of her mother?

[Moore:]         Only — I did that twice. I called her mom.
> That's what happened in January. I called
> her mom during that argument and I told
> her that — I said, ["]Ha-ha, we're still
> living together.["] I left a message, and I
> did it off Katelyn's cell phone. So there
> wasn't — she couldn't deny it to her mom.
> You know what I mean?

Even if Moore's sister and mother had also testified that the victim lied to her family, Moore has not shown the outcome at trial would have changed. *Adams v. Balkcom*, 688 F.2d 734, 741 (11th Cir. 1982) ("We therefore conclude that Adams suffered no prejudice from his counsel's failure to call the medical personnel who treated appellant since such evidence would have been cumulative."). Ground Seven is denied.

**Ground Eight**

Moore asserts that trial counsel was ineffective for not moving for a mistrial because the jury tampered with evidence in the deliberation room. (Doc. 1 at 23) At trial, the prosecution introduced into evidence a comforter from the victim's bed. (Doc. 1 at 23) A detective testified that no hair was on the comforter. (Doc. 1 at 23) At sentencing, the prosecutor advised the trial judge that the jury removed the comforter from an evidence bag during deliberations and saw a hair fall onto the table. (Doc. 1 at 23) A juror told the bailiff about the hair and represented that the evidence was a "big part of their argument." (Doc. 1 at 23) The bailiff failed to collect the hair. (Doc. 1 at 23) The post-conviction denied the claim as follows (Doc. 11-7 at 170) (state court record citations omitted):

> [T]he Defendant alleges that counsel was ineffective for failing
> to object to evidence tampering. The Defendant indicates that
> after sentencing, the State informed the Court that one of the

59

jurors had told a bailiff after the verdict that when they opened the victim's comforter, State's Exhibit 13, during its deliberation, a piece of cut hair fell onto the table. The Defendant asserts that when State's Exhibit 13 was opened and displayed for the jury during the trial, there was not any hair on the comforter. He therefore asserts that there was obvious evidence tampering because the comforter was "contaminated with hair not previously present" and that counsel should have moved for a mistrial. The Defendant contends that had counsel alleged and demonstrated a probability of tampering, and had the State then been unable to establish a proper chain of custody, then State's Exhibit 13 would have been inadmissible. He alleges that had counsel moved the Court for a mistrial on the basis of evidence tampering, the Court would have granted the motion or, alternatively, the matter would have been preserved for appellate purposes, and the appellate court would have reversed his conviction.

The Court previously found this claim to be facially sufficient and reserved ruling on this claim until the Defendant filed an amended motion or until the time allotted to him to do so expired. This claim must be denied because counsel was not deficient.

As the Defendant concedes in his motion, his counsel and the trial court were only made aware of the alleged evidence tampering after the jury had reached its verdict and the Court had taken the verdict and excused the jurors. Thus, a motion for mistrial would have been inappropriate at that stage. Rather, a motion for new trial would have been the proper vehicle to address the issue complained of here. *See State ex rel. Sebers v. McNulty*, 326 So. 2d 17, 18 n.1 (Fla. 1975) (stating that a motion for mistrial can only by made during a trial, while a motion for new trial can only be made after a trial). The record reveals that counsel did in fact file a motion for new trial in the Defendant's case based on the fact that after the jury was excused, one of the jurors had told a bailiff that she was concerned about the condition of the comforter. After a hearing on the matter, the Court denied the Defendant's motion for a new trial. Therefore, counsel was not deficient and this claim is denied.

Just after the trial court sentenced Moore, the prosecutor advised that a juror had raised a concern with the bailiff after trial. (Doc. 11-2 at 91–93)  The juror told the bailiff that during deliberations the jurors inspected the comforter and a piece of hair fell onto the table

from the comforter. (Doc. 11-2 at 91–93) The bailiff reported that the juror "said that was a big part of their argument." (Doc. 11-2 at 92) Trial counsel filed a motion, argued that "the comforter was cross-contaminated with hair which fact apparently played an important part in the jury's verdict[ ]," and asked for a new trial. (Doc. 11-7 at 295–96) Trial counsel argued the motion at a post-trial hearing, and the trial court denied the motion as follows (Doc. 11-7 at 313–17):

[Court:]          All right, I agree with the State on this, that there's been no showing by the defense to meet the burden that's required for interview of jurors. There's been no showing of [overt acts], prejudicial acts, or external influences that may have affected or influenced the verdict in this case.

                                       The defense states in its argument that they can't suggest there's been any misconduct here, and they're not alleging that there's been juror misconduct. In all of the cases cited by the defense, juror misconduct is raised as a basis for seeking an inquiry of the juror. And in each of those cases cited by the defense, there's something in particular that's alleged as the misconduct.

                                         . . .

                                         And in this case, there are no assertions that there's been jury misconduct. There's an assertion that after the trial, a juror made a comment about — and what the defense has cited today, specifically, said to the bailiff, "The evidence may not be in the same condition as it had been during the trial."

                                         And after the jury had reached a verdict in this case, and the Court had taken the verdict and excused the jurors, there was a disclosure that a juror made a comment about, "The comforter might not be in the

61

same condition," or "Hair may not be in the same condition as it was on the comforter [if] this case is reviewed on an appeal later on," so — and that's it.

So, it's a juror expressing some concern about the condition of the evidence or some portion of an exhibit suggesting that they had taken it out and examined it during the deliberations, and that's all. So there's no suggestion of juror misconduct, or some [overt act], or prejudicial acts, or external influences. This is simply a juror commenting about a concern over the way the evidence may have been returned.

And what's not in the motion is that — and would be on the record, is that the clerk indicated that she received all of the evidence back after the jury was released and the evidence was returned to the clerk. All of the evidence was received back.

And based on this, I don't believe the defense has met its burden of even reasonable grounds to believe that such a challenge would exist, which is something that the defense has requested as a basis for not having an informal conversation with jurors . . . .

There's just insufficient evidence here today to suggest that there would be any basis for doing that. It's not supported under any of the Florida Supreme Court cases or any of the cases cited by the defense. And the motion is denied.

Appellate counsel raised the issue on direct appeal (Doc. 11-3 at 464–66), and the state appellate court affirmed in a decision without a written opinion. (Doc. 11-3 at 486) Consequently, the state court did not unreasonably determine that the record refutes the claim. Ground Eight is denied.

**Ground Nine**

Moore asserts that trial counsel was ineffective for advising him to testify without preparing him to testify. (Doc. 1 at 26–27) He contends that he did not take his medication during trial and lacked the ability to focus and control his emotions. (Doc. 1 at 26) He further contends that he and trial counsel discussed testifying for two minutes, and he made an uninformed decision to testify because "he had no idea what to expect, as he had never before testified in his own defense." (Doc. 1 at 26) The post-conviction court denied the claim as follows (Doc. 11-7 at 171–72) (state court record citations omitted):

> The Defendant claims that counsel was ineffective for failing to prepare him to testify. He asserts that counsel decided at the end of the State's case, without any prior preparation, that the Defendant should testify because it was in his best interest to do so in order to refute the testimony of the victim. He asserts that had counsel properly prepared him to testify, his testimony "would have been significantly different." The Defendant further alleges that had counsel advised the Defendant "to not admit to irrelevant, but prejudicial conduct, it is unlikely the jury would have convicted [him]."

> To state a sufficient claim of ineffective assistance of counsel for misadvising a defendant regarding his exercise of his Fifth Amendment right to testify in his own defense, a defendant must specifically address what counsel should have done to properly prepare him to testify. *See Reynolds v. State*, 99 So. 3d 459, 482 (Fla. 2012) (finding a defendant's ineffective assistance of counsel claim insufficient where he did not "specifically address the manner in which counsel failed to prepare him to testify"). The Defendant alleges that counsel failed to properly advise him to limit his answers to those given on direct examination. Because of this, the Defendant states that he volunteered irrelevant, prejudicial information, such as admitting to battering the victim on the night of the incident, damaging her television by cutting it with a knife, and being in jail for two years. He indicates that had counsel advised him to limit his testimony and "not admit to irrelevant, but prejudicial conduct," that it was unlikely that the jury would have convicted him.

> The Court previously found this claim to be facially sufficient

and reserved ruling on this claim until the Defendant filed an amended motion or until the time allotted to him to do so expired. This claim is without merit as the Defendant fails to demonstrate that he was prejudiced by counsel's failure to prepare him to testify.

At trial, the victim testified that the Defendant hit her, kicked her, flipped her table over, slashed her [television], and cut her hair off. Additionally, there was photographic and tangible evidence of her physical injuries, her chopped hair, her scratched [television], and her flipped table. Officer Michael Demark, Detective Pamela Marland, and Joan Havenor all testified to seeing the victim's extensive and serious physical injuries, and to seeing her chopped off hair, the flipped over table, and her damaged [television]. Additionally, DNA from the Defendant was discovered from a SAVE exam conducted on the victim. Accordingly, there was extensive evidence of the victim's injuries and the physical damage to the items in the victim's residence. Cell phone records and DNA evidence place the Defendant in contact with the victim and at the victim's residence during the time period of the offenses. Therefore, the Court finds that the Defendant was not prejudiced when he admitted at his own trial to hitting and kicking the victim, and to damaging her television, on the night in question.

To the extent that the Defendant claims that he was prejudiced by his testimony that he was in jail while awaiting trial, the Court finds the facts of the Defendant's case to be distinguishable from case law finding it improper to permit a criminal trial to proceed while a defendant is clothed in prison garb. The Defendant is correct that a criminal defendant cannot be compelled to stand trial in prison clothing because it could impair the defendant's presumption of innocence, which is a basic component of the fundamental right to a fair trial. *See Cramer v. State*, 843 So. 2d 372, 372 (Fla. 2d DCA 2003). However, the Defendant does not allege that he was wearing jail clothing or that he was otherwise in shackles. Rather, the Defendant merely suggests that his own testimony that he had been in jail while awaiting trial prejudiced him. Given the overwhelming evidence against the Defendant, the Court finds that there is not a reasonable probability that the outcome of the trial would have been different. As the Defendant has failed to establish prejudice, his claim is denied.

Unrefuted evidence at trial proved that Moore battered the victim and damaged her television. Text messages between the victim and Moore showed that the victim invited

Moore to her home before the crimes (Doc. 11-2 at 195–199, 204–13) and photographs depicted the victim's injuries and the damage to her television. (Doc. 11-2 at 158–89) A crime laboratory analyst testified that partial DNA profiles from swabs of the victim's breast and vagina taken just after the crimes "matched" Moore's DNA. (Doc. 11-3 at 219) Moore left the victim a voicemail just after the crimes lamenting that, "I'm going to hell for what I've done." (Doc. 11-3 at 83) Even if trial counsel had advised Moore not to admit to battering the victim and damaging her television, Moore fails to demonstrate that the outcome at trial would have changed. *Strickland*, 466 U.S. at 694.

On cross-examination, Moore testified as follows (Doc. 11-3 at 300):

| [Prosecutor:] | How old were you when this occurred, when you beat the victim? |
|---|---|
| [Moore:] | Thirty-three. I've been in jail for two years. |
| [Prosecutor:] | Thirty-three? |
| [Moore:] | Yeah. |

Because trial counsel did not elicit the fact that Moore was in jail for two years and instead Moore volunteered that information himself, trial counsel was not ineffective. *Holladay v. Haley*, 209 F.3d 1243, 1253 (11th Cir. 2000). At the beginning of trial and during the final charge, the trial court instructed the jury that Moore was presumed innocent and the prosecution had to prove his guilt beyond a reasonable doubt. (Doc. 11-3 at 13, 16, 411–12) The jury is presumed to have followed the instructions. *Evans*, 568 U.S. at 328. Even if trial counsel had advised Moore not to make this brief reference to his pretrial detention, the outcome at trial would not have changed. *Strickland*, 466 U.S. at 694. *Accord United States v. Villabona-Garnica*, 63 F.3d 1051, 1058 (11th Cir. 1995) (holding that a brief, unelicited, and unresponsive reference at trial to the defendant's pretrial detention does not violate due

process).

Lastly, despite Moore's contention that he lacked the ability to focus and control his emotions during his testimony because he was not taking his medication, the record shows that Moore testified intelligently, coherently, and deliberately. (Doc. 11-3 at 275–316) Consequently, the state court did not unreasonably apply *Strickland*. Ground Nine is denied.

**Ground Ten**

Moore asserts that trial counsel was ineffective for not objecting to the verdict form which lacked the necessary lesser included offense of simple burglary. (Doc. 1 at 28–29)

Moore did not raise this claim in his second amended Rule 3.850 motion (Doc. 11-7 at 151–52), but he did raise the claim in his brief on appeal. (Doc. 11-8 at 369–72). Because the Respondent concedes on federal habeas that the claim is exhausted (Doc. 9 at 38), the Court reaches the merits of the claim. 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."). The state appellate court's denial of relief without an opinion (Doc. 11-8 at 384) is an adjudication on the merits owed deference under 28 U.S.C. § 2254(d). *Richter*, 562 U.S. at 98.

The information charged Moore with burglary with a battery (Doc. 11-2 at 24) and simple burglary is a necessary lesser included offense. *Hartley v. State*, 27 So. 3d 233, 233 (Fla. 2d DCA 2010) ("Simple burglary is a necessarily lesser-included offense of burglary with a battery."). The verdict form listed "burglary, as charged," and "battery, as included," but failed to include simple burglary as a lesser offense. (Doc. 11-2 at 65) During the charge conference, trial counsel asked for only battery as a lesser included offense. (Doc. 11-3 at 234, 323–27)

Even if Moore could show that trial counsel deficiently performed by not requesting simple burglary as a lesser included offense, he could not demonstrate prejudice under *Strickland*. Simple burglary requires proof that the defendant "enter[ed] a dwelling, structure, or a conveyance with the intent to commit an offense therein . . . ." Fla. Stat. § 810.02(1)(b)(1). Burglary with a battery requires proof that "in the course of committing the [burglary,] the offender: Makes [a] . . . battery upon any person." Fla. Stat. § 810.02(2)(a). At trial, the victim testified that Moore forced his way into her home, physically battered her, damaged her television, and sexually battered her. (Doc. 11-3 at 38–84) Moore testified that the victim invited him into her home, the two had consensual sex, and he damaged her television and physically battered her after the consensual sex. (Doc. 11-3 at 292–300)

Because Moore admitted that he physically battered the victim inside her home, the only issue in dispute at trial for the burglary charge was whether Moore entered the home with the intent to commit that battery. Even if the trial court had instructed the jury on simple burglary, the outcome at trial would not have changed. *Strickland*, 466 U.S. at 694. *Johnson*, 256 F.3d at 1183 ("[T]here is little evidentiary foundation for Johnson's belief that the jury in his case might have been inclined to convict for felony murder in lieu of the other offenses. . . . [U]nintentional murder was not so viable an option for the jury that the absence of an instruction on felony murder amounts to *Strickland* prejudice.").

Also, the trial court instructed the jury: "If you return a verdict of guilty, it should be for the highest offense which has been proven beyond a reasonable doubt." (Doc. 11-3 at 417) The jury is presumed to have followed this instruction. *Evans*, 568 U.S. at 328. "To assume that, given the choice, the jury would now *acquit* the defendant of the same crime of which it convicted him, and instead convict of a lesser offense, is to assume that the jury would

disregard its oath and the trial court's instructions." *Sanders v. State*, 946 So. 2d 953, 958–59 (Fla. 2006) (italics in original).

Consequently, Moore's claim of prejudice is speculative and the state court did not unreasonably apply *Strickland*. *Sanders*, 946 So. 2d at 959 ("[A]ny finding of prejudice resulting from defense counsel's failure to request an instruction on lesser-included offenses necessarily would be based on a faulty premise: that a reasonable probability exists that, if given the choice, a jury would violate its oath, disregard the law, and ignore the trial court's instructions."); *Strickland*, 466 U.S. at 694 ("An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like."). *Accord Crapser v. Sec'y, Dep't Corrs.*, No. 20-12898, 2021 WL 1955871 at *2–*3 (11th Cir. May 17, 2021) (applying *Sanders* to conclude that the petitioner failed to demonstrate prejudice under *Strickland*). Ground Ten is denied.

**Ground Eleven**

Moore asserts that trial counsel was ineffective for not objecting to testimony by a detective and the victim concerning blood on the comforter, sheet, and pillowcase from the victim's bed. (Doc. 1 at 30–31) He contends that the prosecution presented no scientific evidence to substantiate whether the stains were the victim's blood (Doc. 1 at 30–31) and no evidence concerning the chain of custody of the items. (Doc. 1 at 30) He further asserts that trial counsel was ineffective for conceding in closing argument that the comforter had blood stains. (Doc. 1 at 31) He contends that the absence of blood on the comforter would have proven both that he did not batter the victim before sex and he and the victim had consensual sex before the battery. (Doc. 1 at 31)

The post-conviction court denied the claim as follows (Doc. 11-7 at 174–75) (state

court record citations omitted):

> The Defendant claims that counsel was ineffective for failing to object to the admission of State's Exhibit 13, which was the bedding collected from the victim's residence. It appears that he argues that counsel should have objected to the "blood evidence" contained on State's Exhibit 13 on three separate bases: first, due to a violation of the chain of custody regarding the bedding; second, due to a lack of testing to confirm that the substance on the bedding was blood; [and] third, because Detective Marland's statement that the victim had identified the bedding constituted hearsay. The Defendant asserts that due to counsel's deficiency, "it cannot be said to reflect a reliable outcome."

> The Court previously struck this claim as being facially insufficient because the Defendant had not made a sufficient allegation of prejudice pursuant to *Strickland*. In his amended motion, the Defendant appears to abandon the first and third bases for objection and now solely alleges that counsel should have objected on the basis of improper opinion, *i.e.*, that an expert did not opine that the stains were blood. The Defendant alleges that had counsel so objected, it would have given credibility to his own version of events — that he had been invited into the victim's home, they had consensual sex, and afterward they had an argument that became physical — and thus the outcome of the trial would have been different.

> Initially, the Court notes that Detective Marland merely testified that the stains and markings "appeared" to be blood. *See Bolin v. State*, 41 So. 3d 151, 157 (Fla. 2010) (finding that because witness testimony was that what he saw "appeared" to be blood, it is not likely that he misled the jury to the defendant's prejudice); *see also Gardner v. State*, 480 So. 2d 91, 93 (Fla. 1985) (stating that "[a] lay witness may give opinion testimony so long as the opinion testimony does not mislead the trier of fact."); *Floyd v. State*, 569 So. 2d 1225, 1231–32 (Fla. 1990) (finding that a police officer's testimony that a tablecloth found lying on the bed appeared like it had blood on it was proper and "within the permissible range of lay observation and ordinary police experience"). Thus, any objection by counsel would have been overruled.

> Additionally, although counsel did not object to Detective Marland's opinion that the markings on the victim's comforter were blood, counsel did cross-examine Detective Marland regarding this issue. Specifically, counsel elicited testimony that the markings on the comforter were not actually processed, no

presumptive test was done to prove that the stains were blood, and no testing was done to determine whose blood it was. Therefore, it was clear to the jury that the stains and markings on the comforter had not been scientifically tested or otherwise proven to be blood. Accordingly, the Defendant was not prejudiced and this claim is denied.

In his petition, Moore contends that trial counsel should have objected to the victim's testimony concerning the blood. (Doc. 1 at 30) At trial, on cross-examination the victim testified as follows (Doc. 11-3 at 94–95):

| [Trial counsel:] | Now, you were bleeding all over the bed, right? |
|---|---|
| [Victim:] | I believe my nose was still bleeding. |
| [Trial counsel:] | Okay. And you bled all over the bed? |
| [Victim:] | I think some of it got on there. |
| [Trial counsel:] | Okay. And, in fact, you testified at the bond hearing that you were crying and bleeding all over the bed. Does that sound right? |
| [Victim:] | Yes. |
| [Trial counsel:] | And that was important to you because the blood was everywhere. |
| [Victim:] | Yes. |

The victim observed blood drip from her nose onto the bed and was competent to testify about her observations. Fla. Stat. § 90.604. *Serrano v. State*, 15 So. 3d 629, 638–39 (Fla. 1st DCA 2009) ("Any witness, however, may testify as to matters within the witness's personal knowledge, including personal observations.").

Moore also contends that trial counsel should have objected to the detective's testimony concerning the blood. (Doc. 1 at 30) On direct examination the detective identified

blood on the comforter, sheet, and pillowcase as follows (Doc. 11-3 at 159–60):

| | |
|---|---|
| [Prosecutor:] | If you could identify what you observed of value to the untrained eye. Kind of hold it together and up. |
| [Detective:] | There was some blood markings on it here, and there is some blood — |
| [Reporter:] | Speak up, please. |
| [Prosecutor:] | You got to testify louder. |
| [Detective:] | Oh, sorry. There is blood markings on the comforter, and I'm not sure with some this other stuff. |
| [Prosecutor:] | But you did observe blood on — |
| [Detective:] | Yeah. |
| [Prosecutor:] | — a few areas of the comforter? |
| [Detective:] | Yeah. |
| [Prosecutor:] | Okay. Okay. There was also a fitted sheet in here? |
| [Detective:] | Yes. |
| [Prosecutor:] | What, if anything, of value did you observe on the fitted sheet? |
| [Detective:] | One mark there. I'm not sure if that's blood or what that is. |
| [Prosecutor:] | You observed some stains and some blood? |
| [Detective:] | Yeah, that was it. |
| [Prosecutor:] | Okay. |
| [Detective:] | This one has got some right here too. Not exactly sure what it is. |

| | |
|---|---|
| [Prosecutor:] | Okay. And on one of the pillowcases did you observe dried blood, what appeared to be based on your training and experience [ ]? |
| [Detective:] | Yes. And this one here, there's a speck of blood, a droplet of blood there. I don't think there is anything on this one here. Yeah, that one's clear. |

The detective testified about what he observed "of value to the untrained eye," conceded that he was unable to identify some stains, and identified "what appeared to be" blood on other stains. Because the detective did not mislead the jury about his observations, his lay testimony concerning the blood was admissible. Fla. Stat. § 90.701. *Bolin v. State*, 41 So. 3d 151, 157 (Fla. 2010) ("[B]ecause Ferns' testimony was that what he saw 'appeared' to be blood, it is not likely that he misled the jury to Bolin's prejudice. . . . 'A lay witness may give opinion testimony so long as the opinion testimony does not mislead the trier of fact.'") (citation omitted). *Floyd v. State*, 569 So. 2d 1225, 1231–32 (Fla. 1990) (holding that an officer's testimony that "a tablecloth found lying on the bed 'appeared like someone had taken some type of object that had blood on it and wiped it on there and left it on the bed'" was a permissible lay observation). Whether the lay testimony concerning the blood was admissible at trial is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433.

On cross-examination the detective conceded that police never tested the items for blood (Doc. 11-3 at 171):

| | |
|---|---|
| [Trial counsel:] | Okay. Now, you had indicated when we were looking at some of the objects just now that on the comforter there was blood? |
| [Detective:] | Yes. |

| | |
|---|---|
| [Trial counsel:] | Now, that actually wasn't processed, was it? |
| [Detective:] | No, it wasn't. |
| [Trial counsel:] | And no presumptive test was actually done on that to prove that it was blood? |
| [Detective:] | No. |
| [Trial counsel:] | And not even whose blood? |
| [Detective:] | No. |

On redirect examination the prosecutor confirmed that police had never tested the items for blood as follows (Doc. 11-3 at 182–83):

| | |
|---|---|
| [Prosecutor:] | Okay. And as you testified and pointed to the jury earlier, you observed based on your training and experience to be blood on the comforter and the pillow case and some of the bedding, correct? |
| [Detective:] | Yes, that is correct. |
| [Prosecutor:] | All right. And was any of the blood in the scene tested in regards to it actually being blood? |
| [Detective:] | No. |
| [Prosecutor:] | That's based on your training and experience? |
| [Detective:] | Yes. |
| [Prosecutor:] | Okay. Through all those crime scenes you've seen, it's your testimony that you observed blood at all of the places you stated? |
| [Detective:] | Yes, that's correct. |

Because the detective admitted that he failed to test the blood at the crime scene and

instead relied on his experience as a police officer to visually identify the red substance as blood, the detective's observation neither misled the jury nor was impermissible opinion testimony. Fla. Stat. § 90.701. *Bolin*, 41 So. 3d at 157.

Also, trial counsel argued during closing argument that the marks on the bed were not blood but alternatively argued that, even if the marks were blood, the evidence of blood did not support the victim's version of events (Doc. 11-3 at 360):

> [Trial counsel:] There was no hair in the bed, none. Detective Marland told you that. There were little patches of what could be blood. She thought it was blood based on her experience as a sex investigator. Can't say it wasn't blood. I can't say for sure whether it is. But let's assume it's blood. If, in fact, [K.D.] had been brutalized as she said and then taken into that room and raped, wouldn't you expect a whole lot of big droplets of blood, blood smears, blood like we saw elsewhere in the apartment?

Because Moore cannot show that an objection to the testimony by the victim and the detective concerning the blood would have succeeded and the outcome at trial would have changed, the state court did not unreasonably apply *Strickland*. *Pinkney*, 876 F.3d at 1297.

Moore abandoned his sub-claim concerning the chain of custody in his second amended Rule 3.850 motion (Doc. 11-7 at 153–54) but raised the claim in his brief on appeal. (Doc. 11-8 at 373). Because the Respondent concedes exhaustion on federal habeas (Doc. 9 at 40), the Court addresses the merits of the claim. 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."). The state appellate court's denial of relief without an opinion (Doc. 11-8 at 384) is an adjudication on the merits owed deference under 28 U.S.C. § 2254(d). *Richter*, 562 U.S. at 98.

Before trial, the parties stipulated to the chain of custody of all items removed from the victim's home because the technician who processed the items was unavailable. (Doc. 11-2 at 219–20) Even though the detective testified that he was not present when police collected the items from the victim's home (Doc. 11-3 at 154), Moore presented no allegation of tampering and, consequently, his claim was speculative. *Murray v. State*, 3 So. 3d 1108, 1115–16 (Fla. 2009) ("Generally, relevant physical evidence can be admitted unless there is evidence of probable tampering. Once the objecting party produces evidence of probable tampering, the burden shifts to the proponent of the evidence 'to establish a proper chain of custody or submit other evidence that tampering did not occur.'") (citation omitted). Because an objection would not have succeeded, the state court did not unreasonably apply *Strickland*. *Pinkney*, 876 F.3d at 1297. Ground Eleven is denied.

**Ground Twelve**

Moore asserts that trial counsel was ineffective for not objecting to the prosecutor's improper questions on cross-examination when Moore testified. (Doc. 1 at 32–33) He contends that the prosecutor improperly used the phrases "and your testimony today to the jury is that," and "now your testimony is that," when asking Moore questions. (Doc. 1 at 33) He asserts that the use of the phrases insinuated that Moore had a different version of events at another time, even though Moore made no prior statements. (Doc. 1 at 33) The post-conviction court denied the claim as follows (Doc. 11-7 at 175–76) (state court record citations omitted):

> [T]he Defendant claims that counsel was ineffective for failing to object to improper questioning of the Defendant on cross-examination. He indicates that the State opened a question by stating, "And your testimony today to the jury is that . . . ." and later opened another question by stating, "And now your testimony is that . . . ." The Defendant argues that such phrasing

was intended to insinuate to the jury that the Defendant had testified differently on some other occasion. He asserts that counsel's failure to object to such questioning allowed the State to attack the Defendant's credibility without a proper basis to do so.

The Court previously struck this claim as being facially insufficient because the Defendant failed to allege prejudice with respect to this claim. In his amended motion, the Defendant alleges that but for counsel's failure to object to the State's phrasing of its questions as noted above, the result of the proceeding would have been different because the case turned on his credibility versus the victim's.

The Court finds this claim to be without merit. Taken in context, the State was attempting to clarify the Defendant's account of his side of the story. Specifically, the State asked, "[a]nd your testimony today to the jury is that you two kiss?" regarding when he first got to the victim's door; and, the Defendant did in fact testify as such on direct examination. Then, the State asked, "[a]nd now your testimony is that you guys — after that, after you're in the bathroom, you immediately engage in consensual vaginal, anal sex? You admit to that?" The Defendant did in fact testify as such on direct examination. The State made no mention of any other testimony or statements that the Defendant had previously made or had not made on direct examination. Accordingly, the Court finds that the Defendant's allegation that this line of questioning by the State was intended to insinuate to the jury that the Defendant had testified differently on some other occasion is entirely speculative. Pure speculation cannot form the basis for postconviction relief. *See Spencer v. State*, 842 So. 2d 52, 63 (Fla. 2003); *see also Bass v. State*, 932 So. 2d 1170, 1172 (Fla. 2d DCA 2006). Therefore, this claim is denied.

As to the first challenge, at trial on direct examination, Moore testified that he kissed the victim when he first arrived at the victim's home. (Doc. 11-3 at 292) On cross-examination, the prosecutor asked Moore, "And your testimony today to the jury is that you two kiss[ed]?" (Doc. 11-3 at 307) As to the next such challenge, at trial on direct examination, Moore testified that he arrived at the victim's home, asked her to move out of his way because he had to go to the bathroom, had consensual vaginal sex with her, and attempted anal

intercourse. (Doc. 11-3 at 292–94) On cross-examination, the prosecutor asked Moore, "And now your testimony is that you guys — after that, after you're in the bathroom, you immediately engage in consensual vaginal, anal sex? You admit to that?" (Doc. 11-3 at 307) As to the final challenge in this regard, on direct examination, Moore testified that the victim told him, "You're [going to] go f*ck your little whore," and "pop[ped]" his finger. (Doc. 11-3 at 296) On cross-examination, the prosecutor asked Moore, "So your testimony is that you broke your — she broke your finger, not that you broke your finger on her face?" (Doc. 11-3 at 313)

As to each of these points of cross examination, the prosecutor's questions directly referred to Moore's testimony on direct examination — not to testimony at some other proceeding. Because the record refutes Moore's claim, the state court did not unreasonably deny the claim. Ground Twelve is denied.

**Ground Thirteen**

Moore asserts that appellate counsel was ineffective for not raising on direct appeal that the trial court erred by admitting cumulative and inflammatory photographs of the victim's injuries. (Doc. 1 at 34–35)

Moore raised the claim in his petition alleging ineffective assistance of appellate counsel (Doc. 11-5 at 7–12) and the state appellate court denied the claim in an order without an opinion. (Doc. 11-5 at 195) The unelaborated order is an adjudication on the merits that receives deference under Section 2254(d). *Richter*, 562 U.S. at 98.

*Strickland* applies to an ineffective assistance of appellate counsel claim. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). Because trial counsel objected to the photographs at trial (Doc. 11-3 at 74–77) and moved for a new trial (Doc. 11-2 at 145), appellate counsel was

ineffective only if the issue would have succeeded on direct appeal.  *Diaz v. Sec'y, Dep't Corrs.*, 402 F.3d 1136, 1144–45 (11th Cir. 2005) ("Appellate counsel would not have prevailed on this argument, and nonmeritorious claims that are not raised on appeal do not constitute ineffective assistance of counsel.").

The trial court overruled trial counsel's objection to the photographs as follows (Doc. 11-3 at 74–77):

| | |
|---|---|
| [Trial counsel:] | Judge, I have concerns about these photographs in that they are cumulative in nature. They're further removed from the actual incident, and I think they are — they lack probative value in terms of just the [sheer] horror value of them. |
| [Court:] | Okay. Can I see the other — they were A through E. Okay. So let me see that set. Okay. |
| [Trial counsel:] | It's the ones involving the eyes that I think are particularly gruesome and not particularly probative beyond everything that's already been introduced and also anticipating the doctor's testimony tomorrow. |
| [Court:] | Okay. Mr. Thomas, do you have any response? |
| [Prosecutor:] | Judge, I believe, you know, these types of injuries take a few days to show up. These are photographs taken two and a half days — since we're talking about any early morning incident at 4:00 a.m. They were taken two and a half days later, which is when these injuries actually appeared. You can see the contrast. All you see is a swollen face on the night in question at the hospital. These are a result of those injuries. |
| [Court:] | Okay. |

[Prosecutor:]      They show — they better show the actual facial injuries of what she sustained.

[Court:]      Well, the ones of the eyes are — there are four of the eyes. The other ones aren't of the eyes. So those four are your specific objection?

[Trial counsel:]      Yes, ma'am.

[Court:]      Okay.

[Trial counsel:]      I think the other ones are relevant —

[Court:]      Okay.

[Trial counsel:]      — and not cumulative, but these, in fact, concern me.

[Court:]      That's 5A, B, C and D that the defense is specifically objecting to. So they do — they are definitely different from what's depicted in 4A through 4E that's previously been admitted, some of which in 4A through E are the back and the hair, and then the face is in the first three A, B, and C.

[Prosecutor:]      I would just advise the Court these are the photos taken. Not all these — these photographs taken a few days later of different angles and different injuries that were not taken due to her treatment the night in question.

[Court:]      Okay.

[Prosecutor:]      But —

[Court:]      Well, I mean, I think that they're relevant and that they depict the victim's injuries and that four of them seem to be depicting something different about the injuries to the eye. For example, one has the eye open and shows the actual eye that's red, and

> then one has the eye closed so you can see
> the bruising to the eye area. Actually two
> of them are like that, but one is of each eye.
> And then one is of both eyes open, showing
> bruising and redness on both eyes with the
> eyes open. So the objection is overruled.

"'[E]vidence of victim injury, even where not an element of the offense charged, is admissible if otherwise relevant.'" *Jackson v. State*, 212 So. 3d 505, 506 (Fla. 1st DCA 2017) (citation omitted). "Admission of photographs appears to be reversible error only when the photographs have little or no relevance or the photographs are so shocking in nature as to outweigh their relevance." *Waggoner v. State*, 800 So. 2d 684, 686 (Fla. 5th DCA 2001) (citations omitted). "The admission of photographic evidence is within the sound discretion of the trial court." 800 So. 2d at 686.

The trial court accurately described the photographs of the victim's eyes. (Doc. 11-2 at 180–83) One photograph depicted the victim's eyes together and open. (Doc. 11-2 at 180) Two other photographs depicted each eye closed. (Doc. 11-2 at 181–82) A fourth photograph depicted blood in the victim's open left eye. (Doc. 11-2 at 183) The detective testified that he observed dark bruising on the victim's eyes three days after the crimes and took the photographs to document the delayed injuries to the eyes. (Doc. 11-3 at 166–67) Because the photographs were relevant to prove that Moore battered the victim and were neither unnecessarily repetitive nor "shocking in nature," the issue on appeal would not have succeeded and the state court did not unreasonably apply *Strickland*. *Diaz*, 402 F.3d at 1144–45. *Jackson*, 212 So. 3d at 506 ("Photographic evidence of injuries in an aggravated battery case may be relevant to determine whether a battery occurred in the first place . . . ."); *Sparre v. State*, 289 So. 3d 839, 856 (Fla. 2019) ("The photographs provided a much clearer understanding of the victim's injuries than what could have been accomplished through the

medical examiner's testimony alone, and for this reason, were probative . . . ."). Ground Thirteen is denied.

**Ground Fourteen**

Moore asserts that appellate counsel was ineffective for not raising on direct appeal as fundamental error the failure of the jury to specifically find that he committed the burglary in a dwelling and with a battery. (Doc. 1 at 37–38) He contends that the absence of findings by the jury violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). (Doc. 1 at 37–38)

Moore raised the claim in his petition alleging ineffective assistance of appellate counsel (Doc. 11-5 at 18–23), and the state appellate court denied the claim in an order without an opinion. (Doc. 11-5 at 195) The unelaborated order is an adjudication on the merits that receives deference under Section 2254(d). *Richter*, 562 U.S. at 98.

Because trial counsel did not object to the absence of interrogatories on the verdict form based on *Apprendi* (Doc. 11-3 at 323–27), appellate counsel was ineffective only if an *Apprendi* violation is fundamentally erroneous. *Pinkney*, 876 F.3d at 1296–97. By denying the claim in an unelaborated order, the state court implicitly concluded that any *Apprendi* violation was not fundamentally erroneous. *Pinkney*, 876 F.3d at 1296–97. Fundamental error is an issue of state law, and a state court's determination of state law receives deference in federal court. *Pinkney*, 876 F.3d at 1297–99. The state supreme court holds that an *Apprendi* violation is not fundamentally erroneous. *Hughes v. State*, 901 So. 2d 837, 844 (Fla. 2005) ("[C]oncerning *Apprendi*, we held in *McGregor v. State*, 789 So.2d 976, 977 (Fla. 2001), that a claim of *Apprendi* error must be preserved for review and we expressly rejected the assertion that such error is fundamental.").

Even so, unrefuted evidence proved that, during the commission of the burglary,

Moore entered a dwelling and battered the victim. Photographs proved that the structure where the burglary occurred was a dwelling — the victim's home. (Doc. 11-2 at 156, 159, 162–73) Other photographs — and Moore's own testimony — proved that Moore physically injured the victim after he entered her home. (Docs. 11-2 at 175–89 and 11-3 at 298–99) Also, the jury found Moore guilty of sexual battery (Doc. 11-2 at 66), and the evidence proved that Moore had sex with the victim in the victim's bedroom. (Doc. 11-7 at 210–17) Consequently, an *Apprendi* violation was harmless beyond a reasonable doubt. *Washington v. Recuenco*, 548 U.S. 212, 218–20 (2006); *Galindez v. State*, 955 So. 2d 517, 522–23 (Fla. 2007). Because the issue on appeal would not have succeeded, the state court did not unreasonably apply *Strickland. Diaz*, 402 F.3d at 1144–45. Ground Fourteen is denied.

Accordingly, it is **ORDERED** that Moore's petition for the writ of habeas corpus (Doc. 1) is **DENIED**. The Clerk is **DIRECTED** to enter judgment against Moore and **CLOSE** the case.

<u>**CERTIFICATE OF APPEALABILITY**</u>
<u>**AND**</u>
<u>**LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**</u>

Moore neither makes a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues. *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). Consequently, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. Moore must obtain permission from the court of appeals to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida on August 11, 2021.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE